UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION


MICHELE L. RAFFERTY,      )

et al.,                   )

          Plaintiffs,     ) Case No.

    -vs-                   ) 4:16CV00430

TRUMBULL COUNTY, OHIO,    ) Judge Benita

et al.,                   ) Pearson

          Defendants.     )

          - - - o0o - - -

     Deposition of MICHELE L. RAFFERTY, a

Plaintiff herein, being called by the

Defendants as if upon cross-examination

under the statute, and taken before Angelika

P. Shane, a Notary Public within and for the

State of Ohio, pursuant to agreement of

counsel, on Thursday, the 23rd day of

February, 2017, at 10:00 a.m., at the

offices of Mazanec, Raskin & Ryder Co., LPA,

34305 Solon Road, Solon, Ohio.

          - - - o0o - - -

1    APPEARANCES:

2

3         ON BEHALF OF THE PLAINTIFFS:

4

5         Ford, Gold, Kovoor & Simon, Ltd.

6         Sarah Thomas Kovoor, Esq.

7         Thomas D. Lambros, Esq. (Of Counsel)

8         8872 East Market Street

9         Warren, Ohio  44484

10        330-856-6888

11        kovoor@neo-lawgroup.com

12        lambros@neo-lawgroup.com

13

14

15        ON BEHALF OF THE DEFENDANTS

16        TRUMBULL COUNTY, OHIO, TRUMBULL COUNTY

17        SHERIFF'S DEPARTMENT, THOMAS L.

18        ALTIERE, SHERIFF, AND ERIC SHAY,

19        LIEUTENANT:

20

21        Mazanec, Raskin & Ryder Co., LPA

22        Todd M. Raskin, Esq.

23        34305 Solon Road

24        100 Franklin's Row

25        Solon, Ohio  44139

1          440-248-7906

2          traskin@mrrlaw.com

3

4

5          ON BEHALF OF THE DEFENDANT

6          CHARLES DRENNEN:

7

8          Fishel Hass Kim Albrecht Downey, LLP

9          Angelica M. Jarmusz, Esq.

10         400 South Fifth Street  Suite 200

11         Columbus, Ohio  43215

12         614-221-1216

13         ajarmusz@fishelhass.com

14

15

16         ALSO PRESENT:  Katie Sherman

17                        Robin Wilson

18

19                    - - -

20

21

22

23

24

25

```
 1              P-R-O-C-E-E-D-I-N-G-S

 2                     - - -

 3              MICHELE L. RAFFERTY, of lawful

 4    age, a Plaintiff herein, having been first

 5    duly sworn, as hereinafter certified,

 6    deposes and says as follows:

 7                     - - -

 8    CROSS-EXAMINATION OF MICHELE L. RAFFERTY

 9    BY MR. RASKIN:

10    Q    Okay.  Would you please state your

11    full name for the record?

12    A    Sure.  Michele Lee Rafferty.

13    Q    How would you like me to refer to you:

14    Miss Rafferty, Michele?  You tell me.

15    A    Oh, Michele is fine.  Thank you.

16    Q    You're welcome.  So, Michele, my name

17    is Todd Raskin and we met just a few moments

18    ago, and I represent all of the Trumbull

19    County defendants other than former

20    Corrections Officer Drennen.

21    A    Okay.

22    Q    I'm going to be asking you some

23    questions today concerning the claims you

24    make and your background, and what have

25    you.  Have you ever given a deposition
```

1  before?

2  A    No, sir, I haven't.

3  Q    Okay.  You have very able counsel and

4  I'm sure that they've told you what to

5  expect.  However, my wife tells me I'm

6  sometimes unpredictable, so with that in

7  mind, even though I may be repetitive

8  --

9                MR. RASKIN:    And, Ms.

10          Sherman, this will keep me from

11          having to go over this with you.

12  BY MR. RASKIN:

13  Q    There are a couple of things I'd like

14  to remind you of.  The first is this is a

15  formal proceeding and it's a question and

16  answer session.

17  A    Mm-hmm.

18  Q    And because it's a question and answer

19  session, it's very important we not talk

20  over one another because Angie here can't

21  write down what we're both saying

22  simultaneously, okay?

23  A    Certainly.

24  Q    It's also important that you respond

25  with verbal answers because Angie isn't

1   allowed to interpret what you mean if you

2   say uh-huh or huh-uh or shake your head or

3   nod your head like you're doing now.  I

4   always get witnesses to do that.

5        So if you forget, I may say to you, "Do

6   you mean yes by that or do you mean no by

7   that?"  It's not to be insulting.  It's so

8   Angie gets down in the transcript what you

9   are really answering as opposed to what she

10  might perceive you to be answering, okay?

11  A    Okay.

12  Q    If you need to take a break, because

13  this may take several hours, you're welcome

14  to take a break at any time.  And contrary

15  to what other lawyers say, you can ask to

16  speak with your attorneys at any time, even

17  if I've asked you a question and you haven't

18  answered it, I don't care.

19       Just tell me, "I'd like to consult with

20  my lawyers" and we'll give you a conference

21  room where you can go and speak with them if

22  you wish.  Do you understand?

23  A    Okay.  Terrific.

24  Q    Now, if there's any other reason that

25  you need to take a break, you need to use

1   the restroom, go out and stretch your legs,

2   whatever the case may be, you just tell us

3   and we'll take a break and accommodate you.

4   Do you understand?

5   A    Okay.

6   Q    Is there anything that creates a time

7   problem for you today?

8   A    No, not at all.

9   Q    Okay.  Good.  Then let's start with

10  some -- and do you understand everything

11  we've gone over?

12  A    Absolutely.

13  Q    Okay.  Fair enough.  You've given me

14  your full name for the record.  Tell me

15  where you live.

16  A    I live at 3099 Goleta, that's

17  G-O-L-E-T-A, Avenue, and that's Youngstown,

18  Ohio, 44505.

19  Q    How long have you lived there?

20  A    I have lived there right now just for a

21  few months, but I have previously lived

22  there a number of years.

23  Q    Who else lives there with you?

24  A    My mother and father, my daughter

25  Brooklyn and my brother Christopher.

1    Q    How old is Brooklyn?

2    A    She is five.

3    Q    And you say you've lived there just for

4    a few months.  Help me to understand what

5    that means.

6    A    I came home in January, so I've been

7    back home for two months.  Prior to that,

8    I've lived there for a number of years.

9    It's the home I grew up in.

10   Q    Where did you come home from?

11   A    From Marysville.

12   Q    How long were you in Marysville?

13   A    I was gone a total of seven -- just

14   over seven months.

15   Q    So when you say, "gone a total of just

16   over seven months," does that mean you were

17   in Marysville for seven months?

18   A    Yes.

19   Q    And why were you in Marysville?

20   A    I was there on account of a previous

21   conviction for a breaking and entering

22   charge.

23   Q    When you say a previous conviction of

24   breaking and entering, can you help me to

25   understand why the -- strike that.

1      Did the breaking and entering

2 conviction cause you to be sentenced to

3 Marysville?

4 A    Yes, it did.

5 Q    And when were you convicted of breaking

6 and entering?

7 A    I was convicted in June.

8 Q    Of what year?

9 A    June of 2016.

10 Q    And what court convicted you?

11 A    Trumbull County Common Pleas.

12 Q    And how long were you sentenced to

13 serve?

14 A    Six months and I had the additional one

15 month on account of something out of Warren

16 Municipal Court.

17 Q    What is the something out of Warren

18 Municipal Court?

19 A    It was a probation violation out of

20 their court.

21 Q    And was the probation violation the

22 breaking and entering?

23 A    Yes.

24 Q    So when were you actually released?

25 A    I was released January 1st of 2017.

1  Q     Are you on probation?

2  A     No, I'm not.

3  Q     Who was your probation officer when you

4  were on probation?

5  A     Robin is her first name.  I don't know

6  her last name, but that was out of Warren

7  Municipal Court.

8  Q     Have you ever been -- strike that.

9  Apart from the breaking and entering

10  conviction in June of 2016, have you any

11  other convictions for crimes of dishonesty

12  within the last 10 years?

13  A     Yes, I do.  I have had, I want to say,

14  four retail theft misdemeanor charges that

15  stem out of Girard court and Boardman

16  court.

17  Q     And forgive me for being ignorant about

18  this, but does both Girard and Boardman have

19  municipal courts?

20  A     Yes, they do.

21  Q     And when did those theft offenses

22  occur?

23  A     The earliest one was in 2006 and the

24  most recent one was in 2016.

25  Q     So I'm assuming this -- well, strike

Page 11

1    that.

2         When in 2016 did you commit the theft

3    offense?

4    A    That was in April.

5    Q    And which court?

6    A    That would be Boardman court, Mahoning

7    County Court Number 2.

8    Q    So when you said Boardman Municipal,

9    what you really mean is county court?

10   A    The sign for the building is

11   technically Mahoning County Court Number 2.

12   They have a few courts in the county.

13   Q    Okay.  I got it.  And Mahoning County

14   Court Number 2 is located in Boardman?

15   A    Is located in Boardman, exactly.

16   Q    Thank you.  And is that where your

17   probation officer, Robin, was located?

18   A    No.  Robin is located in Warren

19   Municipal Court.

20   Q    Were you sentenced to serve any time as

21   a consequence of these misdemeanor offenses?

22   A    No.

23   Q    Any other crimes of dishonesty within

24   the last 10 years?

25   A    No.

1    Q     On how many occasions have you been

2    incarcerated in the Trumbull County

3    detention facility?

4    A     Three.

5    Q     Tell me when, please.

6    A     Sure.  My first stay there was in 2000

7    and -- I believe it was 2009.

8    Q     Why were you there?

9    A     I was there stemming from the theft

10   charge out of Girard court and I was there

11   for six months.

12   Q     And is the Girard court also a Mahoning

13   County court?

14   A     No.  The name of their court is Girard

15   Municipal Court.

16   Q     And do you know during what six-month

17   time frame you were actually in jail?

18   A     No, I don't recall which month I was

19   released from there.  I can --

20   Q     That's all right.  I should have said

21   this before.  It isn't a memory test.

22   A     Mm-hmm.

23   Q     So all I ask that you do is answer my

24   questions honestly and if your honest answer

25   is "I don't know" or "I don't remember,"

1    that's okay, too.

2    A    Okay.  Terrific.

3    Q    Just tell me, but don't guess because

4    none of us want you to guess.

5    A    Okay.  Good.

6    Q    All right.  So in any event, sometime

7    in 2009 you served six months in the

8    Trumbull County Jail; is that right?

9    A    Yes.

10   Q    Okay.  Did you have any -- did you see

11   or have any exposure to Mr. Drennen at all

12   during that time?

13   A    Yes, I did.

14   Q    I see.

15   A    Yes, because that was my first day.

16   During that time, I did.

17         He was on midnight turns at that time.

18   I was located in B Pod on the women's

19   floor.

20         He was working midnight turn at that

21   time and the only experience I can say I had

22   with him then was that most COs when they

23   come through to do their rounds, their job

24   in the evenings when they check our cells is

25   to stop by quickly, take a look inside of

Page 14

1  our cells, make sure that we don't have any

2  contraband items, make sure there's nothing

3  on our walls, make sure we're not doing

4  anything we're not supposed to.

5      So most COs would casually walk by,

6  glance around the room and move on, whereas

7  Mr. Drennen, when he would do his rounds, it

8  used to make me feel uncomfortable.

9      There's a long window on the front of

10  the door, and rather than standing beside

11  the door, glancing around and moving on, he

12  would square up to the window and as opposed

13  to looking around the cell like most COs

14  did, he would just glare directly at you.

15      And this is the time in the evening

16  when most girls are out of uniform, you're

17  in your white sleep shorts, a white shirt,

18  and so it would be uncomfortable.

19      So when he would be on rounds and I

20  would see, I would always, you know, throw

21  my uniform on and wait till rounds were over

22  before I would get down into my regular

23  white outfits.

24      But as far as any actual contact, like

25  engaging in conversation with him or seeing

1  him engaging in any type of conversation

2  with any other girls, I did not see any of

3  that.

4      In that particular pod in the evening

5  time, we're all locked down in our cells.

6  It wasn't the conditions that I was in

7  during the time in question where it was an

8  open air dorm.

9      So really with your door locked and you

10 have no conversation from cell to cell with

11 other inmates, I didn't witness anything at

12 that particular time.

13 Q    Did you report your discomfort to

14 anyone in jail administration?

15 A    No, I did not.

16 Q    Now, there's a system in the Trumbull

17 County Jail for communicating with jail

18 administration, isn't there?

19 A    Yes.

20 Q    It's called a kite system, isn't it?

21 A    Yes, it is.

22 Q    And tell me what a kite is, please.

23 A    A kite is a formal way to let

24 supervisors know of any type of issue you

25 might be having, if you need to be moved, if

1    another inmate is giving you an issue, if

2    you have a problem with a correction

3    officer.

4    Q    And physically describe the kite for

5    me, please.

6    A    It's three sheets.  There's a pink

7    copy, a yellow copy and a white copy.  When

8    you fill it out, it presses through and the

9    kites are then distributed to whomever they

10   need to get to.

11   Q    And once there is a response to

12   whatever the request is or issue of concern

13   that's written on the kite, the inmate gets

14   the response back?

15   A    That's correct.

16   Q    Isn't that correct?

17   A    You get a copy of your complaint.

18   Q    Right.  So it's a three-part form.

19   Once it's completed, all three parts go to

20   administration, you don't know what happens

21   to it when it's in administration, but

22   ultimately you've kept one part; is that

23   right?

24   A    Not initially.  Initially when you turn

25   the kite in, what happens is after someone

1    has gone over the kite, they then return a

2    copy of the kite to you, so you do get a

3    copy of your complaint back.

4    Q    Along with whatever resolution

5    administration has given?

6    A    If there's a response, mm-hmm.

7    Q    And am I correct that at no time did

8    you ever write a kite complaining of former

9    Correction Officer Drennen's conduct to

10   administration?

11   A    Not at that time, but I will say the

12   inherent problem with their kiting system is

13   this:  That when you ask for a kite, you

14   can't just ask for a kite and the COs give

15   it to you, as it probably should be.

16       What they will do is if you request a

17   kite, whatever CO you ask for it will ask

18   you the reason that you want the kite.  If

19   they don't deem the reason that you want the

20   kite to be okay, they will deny you the

21   kite.

22       And in a situation like I found myself

23   in, I was going to be spending quite a bit

24   of time in there and I was really nervous

25   and apprehensive about being in a position

Page 18

```
 1   where I had to talk about something of such
 2   a serious nature with just any employee,
 3   because my fear was that if I brought this
 4   attention to someone, that it wouldn't stay
 5   -- it wouldn't go just to administration.
 6        I was afraid that either, A, I might be
 7   denied the kite, that -- because when you
 8   ask for the kite also, I should add this in,
 9   whatever correction officer you ask for the
10   kite has to put their name on the complaint
11   form, that they were the one who gave it to
12   you, and then when the problem is addressed,
13   sometimes I've run into this problem, where
14   the CO may not want to be linked to whatever
15   complaint you're having, so they won't want
16   to give you the kite.
17        We can talk about this a little more
18   later down the road because I ran into a
19   problem with the kiting system after this
20   event happened, but I guess what I'm saying
21   is if your question to me is why I didn't
22   ask for a kite, it was because I was worried
23   that what was going on would get out and
24   that it would cause problems for myself the
25   rest of my stay there.
```

```
 1        I didn't want it to be some rumor that
 2   started spreading through the system and
 3   cause me problems because, you can
 4   understand, I was going to be there for
 5   sometime.
 6   Q    Have you completed your answer?
 7   A    Yes.
 8   Q    So my question was much simpler than
 9   that.
10   A    Sorry.
11   Q    Although I appreciate your answer.  You
12   don't have to apologize.
13        My question is simply this:  At no time
14   did you ever report your concerns about
15   Corrections Officer Drennen to
16   administration through the use of a kite,
17   did you?
18   A    No.
19   Q    Okay.  Thank you.
20        Did you ever verbally report your
21   concerns about Corrections Officer Drennen
22   to either Lieutenant Shay, Sheriff Altiere
23   or any other member of the Trumbull County
24   Jail administration?
25   A    No.
```

1   Q     Are you presently employed?

2   A     Yes, I am.

3   Q     Where do you work?

4   A     I work at Station Square restaurant and

5   that's located on Belmont Avenue,

6   Youngstown, Ohio.

7   Q     What do you do there?

8   A     I'm a hostess.

9   Q     How long have you worked there?

10  A     I've worked there for two months now.

11  Q     Who's your supervisor?

12  A     Octavio Bucciemi, B-U-C-C-I-E-M-I.

13  Q     What's his title?

14  A     He's the owner.

15  Q     Now, you told me that you were in the

16  Trumbull County Detention Facility three

17  times, the first you just described as being

18  in 2009 for six months.  When was the next

19  time?

20  A     The next time was my stay that's in

21  question for this matter, so that was in

22  2000 and --

23              THE WITNESS:    Am I correct

24        to say '13?

25  BY MR. RASKIN:

1   Q    Again, it's not a memory contest, but

2   you can't ask your lawyer.

3   A    Okay.

4   Q    So if you remember, tell me.  If you

5   don't remember, I'll see if I can prompt

6   you.

7   A    Okay.  Terrific.  I believe it was

8   somewhere around 2013.

9   Q    If I told you that the records reflect

10  that it was in 2014, would that refresh your

11  recollection?

12  A    '14, correct.

13  Q    Do you know when in 2000 -- here, let

14  me, just before I ask you that, let me

15  withdraw that question for a moment.

16  A    I was released in September, so...

17  Q    According to the records that I have,

18  you were booked into the Trumbull County

19  Jail for possession of heroin use and

20  possession or sale of drug paraphernalia on

21  February 12th, 2014 at 3:56 p.m.  Would that

22  refresh your recollection?

23  A    Terrific.  Yes.

24  Q    Were you convicted of any of those

25  crimes?

1   A    I was convicted of a drug possession in

2   Common Pleas Court through Trumbull County

3   and I was booked in on a probation violation

4   stemming from that charge.

5   Q    In what court were you convicted?

6   A    Trumbull County Common Pleas.

7   Q    And were you convicted of drug

8   possession?

9   A    Yes.

10  Q    Were you convicted of possession for

11  sale?

12  A    No.

13  Q    But it was a felony offense?

14  A    It was, but it was pled down to a

15  misdemeanor charge.

16  Q    Well, were you convicted -- strike

17  that.  That was my fault.  That was a bad

18  question and I apologize.

19       Were you convicted of a misdemeanor or

20  a felony?

21  A    In the end, a misdemeanor then.

22  Q    Was it an M1 misdemeanor drug

23  possession?

24  A    Yes.

25  Q    And how long were you sentenced?

1   A    Just over six months.

2   Q    And did you spend -- was that six

3   months concurrent with your probation

4   violation?

5   A    I served the six months for the

6   probation violation.  Initially in court, I

7   was let out.  I was involved in a treatment

8   program and I -- my probation violation was

9   for not reporting, and then when I did go in

10  late and report, I was sanctioned to spend

11  that time in Trumbull County Jail.

12  Q    So you were in jail from about February

13  12th until sometime in August?

14  A    Yes.

15  Q    Okay.  I have, according to my notes,

16  that you were released on August 16th, 2014.

17  A    Terrific.

18  Q    Is that right?

19  A    Yes.

20  Q    That's consistent with your memory?

21  A    Yes.

22  Q    You weren't transferred to another

23  detention facility, you were released?

24  A    Correct.

25  Q    And is it during this six-month period

1    of time that you claim former Corrections

2    Officer Drennen engaged in inappropriate

3    conduct?

4    A    Yes, it is.

5    Q    I see.  And can you be more specific

6    with respect to the dates and times when you

7    claim Corrections Officer Drennen engaged in

8    this conduct?

9    A    I mean, specifically, no, but there

10   were numerous times throughout my stay.

11   Q    Well, can you drill down to one or more

12   months when you claim that former

13   Corrections Officer Drennen engaged in

14   inappropriate conduct directed at you?

15   A    Certainly.  I would say within the

16   first three months of my stay was when I

17   witnessed it.

18   Q    So that would have been sometime

19   between February 12th and May 12th?

20   A    February and April.

21   Q    Well, February to March would be one

22   month, March to April would be two months,

23   April to May would be three months.

24   A    Yes.

25   Q    I don't want to put words in your

1   mouth, I just want to understand your

2   testimony.

3        So are you saying sometime between the

4   middle of February and the middle of May?

5   A    Sometime between the middle of February

6   and the time that Katie was released would

7   be a more accurate timeline.  I'm not sure

8   of her release date, but that's when it

9   stopped.

10  Q    Now, with regard to the conduct about

11  which you complain, am I correct in

12  understanding that you do not claim that

13  former Corrections Officer Drennen

14  inappropriately touched you in any way; is

15  that correct?

16  A    That's correct, not myself.

17  Q    And so you were released in August of

18  2016, and how long do you remain out before

19  you're once again incarcerated?

20  A    I was out until June of 2017, June,

21  July.

22  Q    Until June of 2017?

23  A    Yes -- or I'm sorry.  2016.

24  Q    Okay.  And why were you -- and then you

25  were arrested for the breaking and entering?

1    A    That's correct.

2    Q    And you did six months plus one

3    additional month on the probation violation

4    in 2016, again at the Trumbull County

5    detention facility, correct?

6    A    That's correct.

7    Q    So I'm having a little bit of

8    difficulty understanding.  Then were you

9    transferred to Marysville?

10   A    Yes.  I spent the 30 days -- well, over

11   30 days actually.  The time I spent going to

12   court for my new charges, plus the 30 days

13   that I did for municipal court, and then I

14   was transferred directly to Marysville to

15   serve out the remainder of that time.

16   Q    On the breaking and entering?

17   A    That's correct.

18   Q    So you did the probation violation in

19   the Trumbull County detention facility?

20   A    Yes.

21   Q    And then the six months in Marysville?

22   A    Yes.

23   Q    And as before, you never wrote a kite

24   -- well, strike that.

25        As before in 2014 during your

1    incarceration at Trumbull County, you never

2    wrote a kite complaining about Correction

3    Officer Drennen to management or

4    administration of the facility, did you?

5    A    No, I did not.

6    Q    And as before, you didn't verbally

7    report your belief that Corrections Officer

8    Drennen was acting inappropriately towards

9    you to Sheriff Altiere, Lieutenant Shay or

10   any other member of the administration of

11   the Trumbull County detention facility, did

12   you?

13   A    No, I did not.  We don't have any

14   contact with, I will say this, with Sheriff

15   Altiere or with Eric Shay, not during the

16   time that I was there, other than when Eric

17   Shay came to speak with me about the events

18   in question.

19   Q    Well, since you've brought that up, let

20   me ask you about that.

21   A    Sure.

22   Q    Do you have a memory of the timeline

23   with respect to when Lieutenant Shay was

24   first made aware of your concerns about

25   Corrections Officer Drennen?

1   A     Sure, I do.

2   Q     What date was that?

3   A     I believe it was the 16th.  Can we look

4   at that?

5   Q     Have you completed your answer?

6   A     Yes.

7   Q     Okay.  Do you have some documents that

8   you've used to refresh your recollection or

9   help you to testify today?

10  A     No.

11  Q     All right.  So when you say, "Can we

12  look at that," what were you referring to?

13  A     Oh, I'm sorry.  I take it back.  What I

14  was referring to was we do have the copy of

15  his formal complaint, which was what

16  initiated Eric Shay to come and speak with

17  me, and I believe that that is dated, so we

18  do have that.

19  Q     So whatever that date is is what you're

20  using to refresh your memory?

21  A     Yes, sir.

22  Q     Okay.  So let me see if I can help

23  you.

24        According to my notes, you correct me

25  if I'm wrong, former Corrections Officer

1   Drennen wrote an incident report on May 4,

2   2014 in which he stated that inmates

3   Cordwell and Rafferty were trying to

4   blackmail him into providing them with

5   contraband.

6        I believe his exact description was

7   that the two of you had asked for cigarettes

8   and a lighter during razors in return for

9   not reporting his conduct to jail

10  administration.

11       Does that help to refresh your

12  recollection?

13  A    Yes, it does.  I have, in fact, read

14  the report, so...

15  Q    So that would have been -- so can we

16  agree that that would have occurred on May

17  4th, 2014?

18  A    Yes, we can.

19  Q    Okay.  Can we agree that on May 5th,

20  2014, Lieutenant Shay reported that

21  complaint -- strike that.

22       Can we agree that Lieutenant Shay

23  became aware of or saw that report on May

24  4th?

25  A    Correct.

1  Q    All right.  Can we agree that by May

2  5th, Lieutenant Shay had reported that

3  complaint to Major Stewart?

4  A    I do not know that he reported, but --

5  Q    That's fine.  Let me ask you the

6  question a little bit differently.

7       Do you have any facts to share with me

8  that Lieutenant Shay did not report former

9  Corrections Officer Drennen's statements

10  concerning your conduct and the conduct of

11  former inmate Cordwell on May 5th to Major

12  Stewart?

13  A    No, I do not.  I think a more accurate

14  way to say that, however, would be that Eric

15  Shay came and spoke with me about the report

16  that Officer Drennen filed against me, and I

17  believe it would be more accurate to say if

18  he reported it to Major Stewart, that he

19  would have reported the complaint against

20  me, not my complaint against him.

21  Q    Well, isn't it a fact that you refused

22  to talk to Lieutenant Shay when he met with

23  you on May 4th or 5th?

24  A    That isn't completely accurate.  No,

25  it's not.

1      This is the way it happened.  When Eric

2    Shay and the other sergeants pulled me out

3    of my pod, they turned our lights on early,

4    before breakfast bags, which are usually

5    served at 5:00, 5:30 a.m., and brought me

6    into a conference area and reported to me

7    the complaint that Officer Drennen had wrote

8    against myself and Tania Cordwell.

9      When I was made aware of that

10   complaint, what I told Eric Shay and what I

11   told him in the presence of other sergeants

12   was that the complaint that he had filed

13   was, in fact, completely false and that that

14   was not what happened, that was not the

15   conversation that was had, or anything, and

16   I told him that at that time, before I was

17   going to speak on the matter, that if they

18   had any questions about what had been going

19   on in our pod, that they could go and ask

20   any of the other girls currently housed in

21   there to tell them about what was really

22   going on.

23      At that time, Eric Shay and the

24   sergeants took me from the conference room

25   down into the booking area and put me in a

1   holding cell.  They then went and

2   individually pulled out the girls who were

3   also housed in Trustee Pod and each of those

4   girls spoke with Eric Shay about what they

5   had witnessed, same as what I had witnessed

6   during the previous months.

7       After they had interviewed all the

8   other girls in there, I then was returned to

9   the conference room and I did speak with

10  Eric Shay about the matters that were going

11  on.

12  Q    Did you refuse to write a statement?

13  A    I wrote a statement and gave it to my

14  lawyer, Sarah.  When I was asked by Major

15  Stewart to give a verbal statement, I did

16  request on audio that I would be more than

17  happy to comply with giving a statement, but

18  that I wanted to make sure that I had

19  counsel present before I did so.

20  Q    Okay.  So let me ask you some questions

21  so that I understand.  So are you telling me

22  that on May 4th or 5th -- well, strike

23  that.

24      Let me see if I can give you some

25  context before I ask you that question.

Page 33

1        According to the information that I

2   have, Lieutenant Shay contacted Major

3   Stewart concerning this matter on May 5,

4   2014, the day after he learned about it.  Do

5   you have any information that would

6   contradict that?

7   A    No, I do not.

8   Q    Do you know the date that -- well,

9   strike that.

10       According to the information that I

11  have, Lieutenant Shay spoke with you the day

12  before, on May 4th, 2014.  Do you have any

13  information that would contradict that?

14  A    No, I do not.

15  Q    According to the information I have,

16  Major Stewart interviewed Tania Cordwell on

17  May 4th, 2014 and also sought to interview

18  you and you refused.  Is that correct?

19  A    That's correct.

20  Q    You say that Lieutenant Shay

21  interviewed the other women in C Pod on May

22  4th, 2014, but you were not present for

23  those interviews, were you?

24  A    No, I was not.

25  Q    So you don't know who was interviewed

1    and what the interviewee said, do you?

2    A    No, I do not.

3    Q    Okay.  It is true, however, that when

4    Major Stewart sought to interview you and

5    asked you to give him a written statement,

6    you declined on May 5th?

7    A    That's correct.

8    Q    Now, are you aware that Major Stewart

9    also interviewed former Corrections Officer

10   Drennen on May 5th?

11   A    Yes, I am.

12   Q    And how are you aware of that?

13   A    I'm aware of that through information

14   made available to me.

15   Q    I'm sorry, I'm going to interrupt you.

16   It violates one of the things I said

17   earlier, but I think you were about to tell

18   me that you learned that, or perhaps been

19   about to tell me that you learned that from

20   your counsel, and that I don't want to

21   know.  Your communications with your lawyers

22   are privileged and I'm not entitled to know

23   what they are, and I apologize for not

24   telling you that in advance.

25          So whenever you're answering any of my

1   questions, if the source of your information

2   is from your counsel, please just tell me,

3   "I can't answer that question because I

4   learned it from my counsel."

5   A    Okay.  Terrific.

6   Q    So with that in mind, did you learn

7   from any other independent source that

8   former Corrections Officer Drennen was

9   actually interviewed on May 5th, 2014?

10   A    So I'll just answer that I can't speak

11   on that at this time.

12   Q    That's fine.

13   A    Thank you.

14   Q    Are you aware of any facts that former

15   Corrections Officer Drennen was not

16   interviewed by Major Stewart on May 5th?

17   A    No, I'm not aware of that.

18   Q    All right.  According to the records I

19   have, Major Stewart also interviewed Ms.

20   Humenik, H-U-M-E-N-I-K, and Ms. Sherman on

21   May 6, 2014.  Are you aware of any facts to

22   the contrary?

23   A    No.

24   Q    According to the information I have,

25   Major Stewart interviewed former inmate

1    Jessica Friend, who at that time was at

2    NEOCAP on May 7, 2014.  Do you have any

3    facts to share with me to the contrary?

4    A    No, I do not.

5    Q    According to the information I have,

6    Major Stewart again interviewed former

7    Corrections Officer Drennen in the presence

8    of the union representative on May 13,

9    2014.  Do you have any facts to share with

10   me to the contrary?

11   A    No.

12   Q    According to the information I have, at

13   that interview, Major Stewart informed

14   former Corrections Officer Drennen that it

15   would be necessary that he undergo a

16   polygraph examination.  Do you have any

17   facts to share with me to the contrary?

18   A    No, I do not.

19   Q    According to the information I have, at

20   that interview, former Corrections Officer

21   Drennen, in the presence of Major Stewart

22   and his union rep, agreed to take a

23   polygraph test.  Do you have any facts to

24   share with me to the contrary?

25   A    No, I do not.

1    Q     According to the information I have, on

2    May 13, at approximately 6:30 p.m., the same

3    day on which he was earlier interviewed by

4    Major Stewart in the presence of his union

5    rep, former Corrections Officer Drennen

6    telephoned the facility, the Trumbull County

7    detention facility, and informed the officer

8    who answered the phone that he was

9    resigning, effective immediately.

10         Do you have any facts to share with me

11   to the contrary?

12   A     No, I do not.

13   Q     So utilizing the timeline that we've

14   just talked about, can we agree that from

15   the time that you were first approached

16   about the conduct which you complained

17   former Corrections Officer Drennen engaged

18   in, which would have been May 4, 2014,

19   until the time that he resigned on May 13,

20   2014, an investigation was immediately

21   undertaken?

22   A     I would not say that because I was not

23   made aware during my time there that an

24   investigation was happening.

25   Q     Okay.  Well, let me ask it

 1   differently.

 2        Do you have any facts to share with me

 3   which would suggest that immediately upon

 4   being notified of your complaints, Trumbull

 5   County detention facility administration

 6   undertook an investigation which commenced

 7   on or around May 5, 2014 and concluded on

 8   or around May 13, 2014 with the resignation

 9   of former Corrections Officer Drennen?

10   A    After I was questioned, at no time did

11   jail staff make me aware that they were

12   currently undergoing an investigation

13   looking into Correction Officer Drennen.

14        I was, for all intents and purposes,

15   left in the dark.  My statement was given, I

16   talked to Mr. Shay and after that, there was

17   absolutely no communication between jail

18   staff and myself.  At no point was any sort

19   of counsel offered, at no point did they

20   offer to send in someone for me to speak

21   with about these events.

22        As a matter of fact, the only way I was

23   able to get in contact with a counselor to

24   speak with what was going on, I had to fill

25   out a form and request to see him.  It's a

1  gentleman; his name is Rick.  He's from

2  Coleman.

3       He's a liaison through the Coleman

4  agency who works with the jail.  He handles

5  inmates who may be on psych medications, who

6  have maybe some emotional problems.  He's

7  there to help counsel anyone who's having

8  issues within the jail.

9       So I had to take it upon myself at that

10  time to fill out a request form and even

11  asked to speak to someone.

12       So, in all honesty, I will say that

13  anything having to do with an investigation

14  going on about Corrections Officer Drennen,

15  I was never made aware of.  The only -- at

16  what point in time I knew that an

17  investigation was being undergone was only

18  through counsel, which you said I can't

19  speak on, so that's fine.

20  Q    Now, I'm going to ask you to listen to

21  the question that I asked.

22                MR. RASKIN:    Angie, read

23            it back, please.

24                     - - -

25                (Record read.)

```
 1                    - - -

 2           MS. KOVOOR:    I'm just

 3      going to object to the vagueness

 4      regarding the investigation because

 5      I'm not sure whether she understands

 6      it's an investigation as to her

 7      complaints or an investigation into

 8      Drennen's complaints against them.

 9           THE WITNESS:    Exactly.

10      Thank you.  I feel like that's

11      getting melded together.

12           MR. RASKIN:    So the

13      problem I have is with speaking

14      objections.  But I think that that's

15      a fair one actually, so I'm not

16      going to argue with you over that.

17 BY MR. RASKIN:

18 Q    Let me ask the question differently.

19 Do you have any facts to share with me that

20 from the time your complaints were reported

21 and former Corrections Officer Drennen's

22 complaints were reported to jail

23 administration, both occurring on or around

24 May 4 or 5, 2014, the jail administration of

25 Trumbull County did not promptly investigate
```

Page 41

1    those complaints between May 4 and

2    concluding on May 13, 2014 with former

3    Corrections Officer Drennen's resignation?

4                MS. KOVOOR:     Objection.

5         Compound.

6    BY MR. RASKIN:

7    Q    You can answer.

8    A    I don't have any information to prove

9    that they were not investigating, but I will

10   also say that I do not have any information

11   -- no information was made aware to myself

12   that they were, in fact, investigating my

13   reports or his reports.

14   Q    Thank you.  Apart from this case, have

15   you ever been either a plaintiff, which is

16   what you are in this case, or a defendant in

17   any other civil case?

18   A    No, I have not.

19   Q    Have you described for me all of your

20   convictions for crimes of dishonesty in the

21   last 10 years?

22   A    Yes, I have.

23   Q    Have you been hospitalized in the last

24   10 years, other than for the birth of your

25   daughter?

1   A    No.  Overnight stays, no.

2   Q    Would you list for me all of the

3   physicians with whom you have treated in the

4   last 10 years, please?

5   A    Certainly.  I've been treated by Dr.

6   Daniel T. Brown.

7   Q    Where is Dr. Brown -- and I'm going to

8   ask you questions about each one.

9   A    Certainly.  That's not a problem.

10  Q    Daniel T. Brown is located where?

11  A    He was previously located on Belmont

12  Avenue in Liberty at the time I saw him.  He

13  is now the director of the healthcare area

14  at Meridian Services currently.

15  Q    Meridian Services is where?

16  A    That's in Youngstown, Ohio as well.

17  Q    What did you treat with Dr. Brown for?

18  A    Dr. Brown was just a normal family

19  physician.  I was transferred to him after

20  my previous family physician, who was Suman,

21  S-U-M-A-N, K., Mishr, M-I-S-H-R, who was

22  also located in Youngstown, Ohio.

23      When Dr. Mishr quit practicing, I was

24  referred to Dr. Brown through his office.

25  Q    Who else have you treated with?

1    A    I've also been treated through Meridian

2    Services through both their healthcare area,

3    their mental health counselors and

4    psychiatrists.

5    Q    Who are their mental health counselors

6    and psychiatrists?

7    A    My most current counselor's name is

8    Kim, and my previous counselor's name is

9    Valerie Prevosnak.

10   Q    Do you want to spell that for the

11   record?

12   A    Sure.  Valerie how it's usually

13   spelled, and P-R-E-V-O-S-N-A-K.

14   Q    And you say Valerie and Kim are both in

15   Meridian Health Services?

16   A    That's correct.

17   Q    Does Meridian Health Services go under

18   any other name?

19   A    Not to my knowledge, no.

20   Q    I can tell you that we have presumably

21   been provided with all of your medical

22   history and there is no reference at all to

23   Meridian Health Services, nor is there any

24   reference to either of the two doctors whose

25   names you've mentioned, Daniel T. Brown or

Page 44

1    Dr. Mishr.

2         Can you explain why that is?  You're

3    sure Meridian doesn't go under Northside

4    Medical Center?

5    A    No, sir.  That's a hospital in our

6    area.  I mean, I was in my counselor's

7    office, I saw all the paperwork that was

8    supposed to have been faxed.  I read over it

9    and signed it.

10   Q    Maybe it goes under a different name.

11   A    Meridian Community Care possibly.

12   Q    Not Townhall?

13   A    No.  That's another facility.

14   Q    We've got a lot of records, but we

15   don't have any records from either of those

16   two providers or any organization known as

17   Meridian.

18        Let me just ask you about the ones that

19   we do have and you can tell me what I'm

20   missing.  According to the records we have,

21   you treated with Townhall from September of

22   2009 until May of 2010.  Did you treat with

23   Townhall?

24   A    That's correct, I did.

25   Q    You treated with Coleman Behavioral

Page 45

1    Health in May of 2010; is that correct?

2    A    With Coleman in 2010?

3    Q    Yes, after being transported to St.

4    Joseph Health Center by your mother for an

5    overdose.

6    A    I don't think that's my paperwork.

7    Q    I'm just asking you is that correct or

8    not, or if you don't know, you can tell me

9    you don't know.

10   A    I don't know that that's correct.

11   Q    I also have that you treated at

12   Northside Medical Center in July of 2013 and

13   again in August of 2013 for recurrent

14   herpes, nasal MRSA?

15   A    Northside, yeah.

16   Q    I have a Neil Kennedy Recovery Center

17   in 2010 for your opioid, cannabis and

18   OxyContin and heroin use; is that right?

19   A    That's correct, and there are -- that

20   wasn't very thorough with Neil Kennedy.

21   There is more time that was spent with that

22   agency than what is listed there.

23   Q    So you don't think --

24   A    So I don't think that that's very

25   thorough.

Page 46

1    Q    I see.  So you don't think they gave us

2    all the records?

3    A    That's correct.

4    Q    I see.  Okay.  And then I have Valley

5    Counseling Center from 11/8/2010; is that

6    correct?

7    A    That's correct.

8    Q    And a Joseph Konieczny,

9    K-O-N-I-E-C-Z-N-Y, a psychologist who you

10   treated with in 2011?

11   A    Correct.

12   Q    So these are all the records I have for

13   you, ma'am.  So are you telling me that we

14   don't have a complete set of treatment

15   records?

16   A    That is correct.

17   Q    Okay.  So, if you don't mind, why don't

18   you tell me what we're missing, please?

19   A    Sure.  What you're missing is I also

20   did a lengthy time of outpatient treatment

21   and individual counseling with Neil Kennedy

22   Recovery Services.  I also --

23   Q    I'm sorry, I don't mean to interrupt

24   you.  Can you give me approximate years?

25   A    Sure.  Prior to the time I spent in

1  Townhall, immediately prior I should say, so

2  up until the date that I was transferred to

3  Townhall 2's agency, I was working on an

4  outpatient basis with Neil Kennedy at their

5  Howland offices, and again upon my release

6  from Townhall 2's agency, when I moved back

7  to the area, I once again re-engaged with

8  Neil Kennedy on an outpatient program and

9  saw an individual counselor following the

10  time I spent at Townhall 2.  I did complete

11  their entire outpatient program that time.

12  Q    So I have Townhall 2 9/1/09 to

13  1/7/2010.  Are you telling me that -- would

14  you then have gone back to treating with

15  Neil Kennedy?

16  A    That's correct.

17  Q    I have Neil Kennedy as 1/8/2010 to

18  2/9/2010.  Are you telling me that you

19  treated with them for some other period of

20  time or a longer period of time?

21  A    Yes.  In addition to what you have

22  there, which would have been after I left

23  Townhall 2's agency, I was also working with

24  them prior to my going to Townhall 2.

25  Q    How about after?

Page 48

1    A    I was engaged with treatment and

2    counseling through Neil Kennedy.  Then I

3    transferred services to a different county

4    where I stayed and was engaged with Townhall

5    2.

6         Then when I moved back to this area,

7    when I finished their program, I re-engaged

8    in another program again with Neil Kennedy.

9    Q    It sounds like what you're telling me

10   is Neil Kennedy hasn't sent us all of your

11   records?

12   A    Correct.

13   Q    I see.  Any other records -- well,

14   strike that.

15        So in what years, then, did you treat

16   with Neil Kennedy after 2010 that we don't

17   have, because we don't have any records --

18   A    It would have been prior to 2010.  It

19   would have been 2008, 2009.

20   Q    How about afterwards?

21   A    After that, no, that was the last time

22   I completed services through them.

23        After that was when I began engaging in

24   services through Meridian Healthcare, and

25   that's the agency that I've been with ever

1   since.

2   Q    Okay.  All right.

3   A    I was engaged with Meridian Healthcare

4   from 2011 up until the point that I was

5   detained in Trumbull County's detention

6   facility in 2013, and then I've been

7   re-engaged with them once again currently, I

8   should say.

9   Q    So you're currently treating with

10  Meridian?

11  A    I'm still currently treating there,

12  that's correct.

13  Q    So we don't have any of this

14  information and so what I'm going to have to

15  do -- we'll go forward with your deposition.

16  A    Sure.

17  Q    But I am going to have to reserve the

18  right to bring you back.

19  A    That's not a problem.

20            MR. RASKIN:    Sarah, at a

21        break, I'll ask that Ms. Rafferty

22        sign a release so that we can get

23        those records.

24            MS. KOVOOR:    I would agree

25        to bring Ms. Rafferty back for the

1           limited purposes of these questions

2           regarding the health discovery that

3           apparently has not been provided.

4               MR. RASKIN:     Well,

5           assuming that's all that hasn't been

6           provided, I can live with that.  If

7           there's more that we find out about,

8           then, of course, I would ask your

9           agreement to expand on that.

10  BY MR. RASKIN:

11  Q    Okay.  So let me just ask you,

12  Meridian -- is it Meridian Healthcare?

13  A    It's called Meridian Services, but I've

14  also seen it headlined on paperwork as

15  Meridian Community Care.  It depends on

16  which end of the facility you are.

17       They offer health care, they offer

18  mental health services, they offer drug

19  addiction counsel.

20   Q    So can you give me the name of --

21  first of all, are you treating at Meridian

22  with any medical professionals?

23  A    Yes.

24  Q    What are their names, please?

25  A    My counselors are Kim and Valerie.

1    Then the psychiatrist there who prescribes

2    the medication, he's new.  I don't know his

3    name yet.  It usually takes about six weeks

4    to get in to him, so I do have an

5    appointment with him, but I have not met

6    with him yet.

7    Q    So have you treated with any -- well,

8    who was the psychiatrist that preceded the

9    one whose name you don't know?

10   A    I can't remember.  It was a strange

11   name.  I'd only see him once a month to have

12   my prescriptions filled.

13        Well, that's what I'm going back for

14   now is to go back on the prescription

15   medications he had me on.

16   Q    Where is Meridian Services located?

17   A    It's located on Meridian Road,

18   Youngstown, Ohio.

19   Q    Do you know the address?

20   A    No, I do not.

21             MS. KOVOOR:    Mr. Raskin,

22        may I ask for a bathroom break,

23        especially for Katie?

24             MR. RASKIN:    Of course.

25                 - - -

1          (Short recess taken)

2               - - -

3  BY MR. RASKIN:

4  Q    Okay.  So let's go back on the

5  record.

6  A    Terrific.

7  Q    Usually people don't tell me

8  "terrific."  Either I'm particularly

9  well-behaved today or you have very low

10  standards, or both.

11       So you're treating at Meridian

12  Services, which is also known as Meridian

13  Community Care.  It's located on Meridian

14  Road in Youngstown, Ohio?

15  A    That's correct.

16  Q    You don't know the name of the

17  psychiatrist who's doing your medication

18  management?

19  A    No.

20  Q    But you do have the names of your

21  counselors?

22  A    Yes, that's correct.

23  Q    May I have the names of your

24  counselors, please?

25  A    Kim, and I don't know Kim's last name.

Page 53

1    And my other counselor's name is Valerie

2    Prevosnak.

3    Q    And you spelled that once,

4    P-R-E-V-O-S-N-A-K?

5    A    N-A-K, that's correct.  Kim Russell.

6    Q    Kim Russell?

7    A    Yes.

8    Q    Okay.

9    A    And if you'd like the address, the

10   address is 527 North Meridian Road,

11   Youngstown, Ohio, 44509.

12   Q    Thank you.

13   A    Sure.

14   Q    And are you counseling with both

15   Valerie and Kim, or did Kim replace Valerie?

16   A    Initially I spent the majority of my

17   time counseling with Valerie.  Valerie has

18   since then gotten a promotion, so Val is my

19   counselor that I see weekly, but Valerie

20   still oversees my caseload and I do still

21   meet with her, just not as often.

22   Q    So you're counseling with Kim Russell

23   weekly?

24   A    Yes.

25   Q    And have you been counseling with Kim

Page 54

1  Russell weekly since you were released from

2  Marysville in January of this year?

3  A    Yes, I have.  I was released on January

4  1st and I re-engaged in treatment on January

5  3rd.

6  Q    Okay.  Are you actively counseling with

7  any other behavioral health professional

8  apart from those associated with Meridian

9  Services, also known as Meridian Community

10  Care?

11  A    No, I'm not.

12  Q    You said that you are on medication

13  management through a psychiatrist at

14  Meridian.  Can you tell me what medications

15  you are presently taking, please?

16  A    Currently I'm not taking any until I

17  see the psychiatrist again, but as per my

18  counselor and I, they most likely will put

19  me back on the same medications I was on

20  prior to.  Those medications are --

21  Q    Wait a minute.  Let me stop you for a

22  minute.

23  A    Sure.

24  Q    When you say the medications you were

25  on prior to, is that prior to re-engaging in

1  January?

2  A    Yes.  The medications -- okay.  Sure.

3  Q    I just want to know what medications

4  you're presently taking.  Is your answer

5  none?

6  A    Today, none.

7  Q    Okay.  And you haven't been prescribed

8  any medications for behavioral health

9  conditions which you have since going back

10  to Meridian in January of this year; is that

11  correct?

12  A    Correct; since I've been back, yes.

13  Q    But you do have an appointment with the

14  psychiatrist at Meridian and when is that?

15  A    Yes.  That is not for another two

16  weeks.  She referred me to them as soon as I

17  re-engaged.  It's just with how many clients

18  they see, it takes a length of time before

19  you can get into the office.

20  Q    So am I correct that you're not taking

21  any prescription medications today?

22  A    That's correct.

23  Q    And you have not taken any since you

24  were released from Marysville?

25  A    That's correct.  The only type of

1    prescription medication that I am prescribed

2    at this point is a monthly shot of Vivitrol

3    and that's it.

4    Q    What's the purpose of that?

5    A    Essentially what it is is it is just an

6    opioid blocker.  It's an injection given

7    once monthly.

8    Q    And do you go to Meridian for that?

9    A    Yes, I do.

10   Q    Apart from the glitch that we've been

11   discussing about your current treatment with

12   Meridian, are there any other medical or

13   behavioral health providers that we do not

14   have records from that you've seen in the

15   last 10 years?

16   A    Not in the last 10 years, although I

17   was previously engaged in mental health

18   counseling prior to that timeline.

19   Q    I understand that.  I'm aware of that,

20   but I'm simply asking about the last 10

21   years.  You understand?

22   A    That's correct.

23   Q    So let me just make sure that we

24   agree.  I have records from Townhall 2 from

25   2009 and again in 2010.  Did you treat with

1  Townhall 2 for a behavioral specialist

2  there?

3  A    Yes, I did.

4  Q    Are you aware of their diagnosis?

5  A    Yes, I am.

6  Q    And what was the diagnosis of the

7  behavioral health professionals at Townhall

8  2?

9  A    My diagnosis through them was that I

10  had PTSD and anxiety problems.

11  Q    Okay.  And the PTSD and anxiety

12  problems preexisted the events which give

13  rise to your lawsuit that occurred in

14  Trumbull County; did they not?

15  A    That's correct.  Those stem from

16  previous incidents of rape that I

17  experienced at a younger age.

18  Q    I see.  You're aware that your PTSD was

19  diagnosed as chronic?

20  A    That's correct.

21  Q    I also have records from Coleman

22  Behavioral Health from May of 2010.  Did you

23  treat with Coleman in May of 2010?

24  A    I did not treat with Coleman directly.

25  I was taken to the hospital and I believe it

Page 58

1   must have been a liaison who probably works

2   with the hospital from the Coleman agency

3   who I met with.  I didn't actually meet at

4   Coleman's offices.

5   Q    But you met with a Coleman

6   representative?

7   A    Correct.

8   Q    And are you aware that you were

9   diagnosed by that Coleman behavioral health

10  specialist?

11  A    I am not aware of that.

12  Q    So you're not aware of what diagnosis

13  --

14  A    No.  I was in the hospital for a short

15  time.

16  Q    You did receive a diagnosis while you

17  were -- as a result of your hospitalization

18  at St. Joseph's; did you not?

19  A    Not to my knowledge.  I don't know what

20  that was.

21  Q    So you don't know you were diagnosed as

22  being opioid and cocaine dependent?

23  A    I'm sure that is correct.

24  Q    Are you aware that you were also

25  diagnosed as suffering from a depressive

1   disorder not otherwise specified?

2   A    If that's what the records show.  I

3   don't have any evidence otherwise.

4   Q    I see.  Are you also aware that you

5   claimed that you were diagnosed as being

6   bipolar?

7   A    That's correct.

8   Q    Did any behavioral health specialist

9   ever diagnose you as being bipolar?

10  A    Yes, they have.

11  Q    Who is that?

12  A    Meridian Healthcare.

13  Q    The one whose records we don't have?

14  A    Yes.

15  Q    Right.  Okay.  Did you see Dr.

16  Konieczny through St. Joseph's?

17  A    If that's what the records show, I

18  don't dispute that.  I don't recall his name

19  in particular, but...

20  Q    You don't know who Dr. Konieczny is?

21  A    No.  I'm sure it was probably the

22  attending physician that night, so...

23  Q    I don't want you to guess.  I also have

24  records from 1/8/2010 to 2/9/2010 from Neil

25  Kennedy Recovery Center.  Did you treat with

Page 60

1  Neil Kennedy at that time?

2  A    Yes, I did.

3  Q    And according to the records, you had a

4  history of two prior treatments at the

5  facility?

6  A    Correct.

7  Q    So you've been in Neil Kennedy three

8  times?

9  A    Four.

10  Q    Four times?

11  A    Two outpatients and two residential.

12  Q    When were the last -- when was the last

13  residential?

14  A    The last residential would have been

15  immediately prior to my Townhall 2's stay.

16  I went in detox in Neil Kennedy's Center and

17  then went immediately from there to Townhall

18  2's facility.

19  Q    I see.  Would that have been in 2009

20  and 2010?

21  A    That would have been, and then I had

22  another one for a detox prior to that.

23  Q    Okay.  And you reported being diagnosed

24  with posttraumatic stress disorder in 2009

25  due to two rapes at the age of 14 and 16?

Page 61

1  A    Correct.  I think the exact ages,

2  however, is 13 and 16.

3  Q    You also treated at Valley Counseling

4  Center in 2010; is that right?

5  A    That's correct.

6  Q    According to their records, you

7  reported being locked in a closet at age 14

8  and being raped.  Are your saying that their

9  records are incorrect, it was actually 13?

10 A    That is incorrect.  It wasn't a closet,

11 it was a bedroom, so that is incorrect as

12 well.

13 Q    And then you reported a date rape at

14 age 17?

15 A    That's correct.

16 Q    You also filed for Social Security

17 Disability; did you not?

18 A    That's correct.

19 Q    And in support of your Social Security

20 Disability claim which you filed in November

21 of 2010, you claimed that you were bipolar

22 and suffering from hepatitis C and you were,

23 therefore, unable to function or work; is

24 that right?

25 A    That's correct.

1    Q    You claim you were unable to function

2    and work dating back to June, 2008.  Is that

3    also correct?

4    A    That's correct.

5    Q    And you submitted to a functional

6    capacity examination; did you not?

7    A    That's correct, I did.

8    Q    And actually the person who performed

9    that was the psychologist, Joseph Konieczny?

10   A    Okay.

11   Q    I apologize.  I didn't mean to mislead

12   you, but I just saw his name.

13   A    Sure.

14   Q    And, in fact, you learned in January of

15   2011 that your application for Social

16   Security Disability was denied?

17   A    That's correct.

18   Q    With a conclusion that your condition

19   was not severe enough to keep you from

20   working?

21   A    That's correct.

22   Q    And, in fact, that's true because

23   you're working, right?

24   A    Yes.  I will say, though, that at the

25   time, I really wasn't.  Emotionally, I was

1   in a place where we had really -- my

2   counselors and I had really been digging

3   into a lot of what happened to me as a

4   child, and I suffer from extremely bad panic

5   and anxiety attacks that were at the time

6   debilitating.

7        I mean, I wouldn't leave the house, and

8   so during those times, you can see on

9   record, I hadn't been employed for an

10  extremely long time.  I had during that time

11  been engaged in a significant amount of

12  treatment.

13       So the only reason that a secondary

14  application wasn't filed with Social

15  Security was on account of I ended up back

16  in Trumbull County's facility.

17  Q    Have you ever treated with or been

18  examined by a psychologist by the name of

19  Robert Gordon?

20  A    Not that I recall.

21  Q    Have you ever traveled to the state of

22  Texas to be evaluated by a psychologist,

23  regardless of his or her name?

24  A    No, I have not.

25  Q    Do you know who Robert Gordon is?

1   A     No, I do not.

2   Q     Do you recall that you received a

3   series of written questions which you were

4   asked to answer under oath from me?  They're

5   called interrogatories.

6   A     Oh, yes.  I apologize.

7   Q     It's a strange name.

8   A     Yes, I do.

9   Q     But they're just written questions,

10  right?

11  A     Yes.

12  Q     And you did answer them honestly and to

13  the best of your belief, right?

14  A     Yes, I did.

15  Q     So I'd like to ask you some follow-up

16  questions about the answers that you

17  provided.

18  A     Certainly.  That's not a problem.

19  Q     So the first question that I asked you,

20  Interrogatory Number 3 asked you to provide

21  me with the name and last known address and

22  telephone number of each and every person

23  who has knowledge pertaining to any of the

24  allegations or claims you make in the

25  lawsuit, and you provided me with the names

1    of other inmates:  Nicole DeNicholas, Tania

2    Cordwell, Jessica Smerdell, Jessica Friend,

3    Jessica Dean.

4         Those were all people who were

5    incarcerated at the same time you were; is

6    that right?

7    A    Correct.

8    Q    Have you obtained statements from any

9    of those people?

10   A    I believe that statements from some of

11   those individuals were written, yes.

12   Q    My question was have you obtained, and

13   I don't mean to mislead you.  I know that as

14   part of the investigation, these individuals

15   or some of them were interviewed and asked

16   to write statements.  Are those the

17   statements you're talking about?

18   A    Yes, the written statements I have

19   read.

20   Q    My question is have you obtained any

21   other statements apart from those given at

22   the jail?

23   A    No, sir.

24   Q    Okay.  You also identify Kevin

25   Rafferty.  Who's Kevin Rafferty?

1   A    That's my father.

2   Q    Okay.  Now, I assume that the -- but

3   you correct me if I'm wrong.  Is it true

4   that any information that your dad, Kevin

5   Rafferty, has about the claims you make in

6   this lawsuit is the result of what you've

7   told him happened?

8   A    Yes.

9   Q    And you also list Ernie Sherman.  Is

10  Ernie Sherman a relative of Katie's?

11  A    Yes, I believe so.  It's some

12  relationship to Katie.

13  Q    Do you know what the relationship is?

14  A    No, I do not.

15  Q    Okay.  I'll ask her.  Am I correct in

16  also assuming that whatever information Mr.

17  Sherman has is information that either you

18  provided to him or you understand Katie

19  Sherman provided to him?

20  A    Correct.

21  Q    In Interrogatory Number 9, I asked you

22  to list any crimes that you've been

23  convicted of, pled guilty to -- or pled

24  guilty to, including the full name, address

25  and telephone number of the court having

1   jurisdiction, the case number, so on and so

2   forth.

3       What you've given me includes the

4   Warren Municipal Court possession of drug

5   abuse instruments.  That was a 2016 case?

6   A    Correct.

7   Q    You were also charged with criminal

8   trespass?

9   A    Correct.

10  Q    Did you plead guilty or no contest to

11  the trespass?

12  A    I don't recall how -- I don't recall

13  how that worked.  That is what I spent the

14  30 days for, for the probation violation.

15  To be honest, I don't recollect how the

16  courts decided on all of that.

17      At the time, we were going fishing

18  behind my daughter's father -- their home.

19  Their backyard backs up into a pond and we

20  were walking back there to go fishing.

21      Well, even though it backs up to their

22  backyard, it does land on city property, so

23  I was ticketed at that time for it, so I

24  don't remember how that played out in

25  court.

```
1        I don't believe -- I think the only

2   thing that I really got charged with was the

3   drug abuse instrument, so I would have to

4   get a court record to see, to give you the

5   correct answer.

6   Q    In 2015, you were convicted of

7   possession of drug abuse instruments?

8   A    That's correct.

9   Q    In 2009, you were convicted of a theft

10  offense?

11  A    Correct.

12  Q    In 2009, you were also convicted in

13  Mahoning County Court of disorderly conduct

14  and a theft offense?

15  A    That's correct.  Those are together.

16  Q    And in Trumbull County Common Pleas

17  Court, attempted possession of heroin and

18  possession of drug paraphernalia?

19  A    Correct.

20  Q    Okay.  And in 2011, breaking and

21  entering and possession of criminal tools?

22  A    Correct.

23  Q    Any other convictions that you have not

24  listed here?

25  A    No.
```

 1   Q     Do you have a degree from Youngstown

 2   State University?

 3   A     I'm a senior there.  I have just a

 4   couple credit hours left.

 5   Q     So the answer's no?

 6   A     That's correct.  I have finished

 7   through a partnership with Kent State

 8   University and The Cleveland Foundation,

 9   I'm certified in both grant researching and

10   grant writing, and I also have tier one and

11   two tax certifications.

12        I previously worked at a bank and a tax

13   agency, and at YSU, I'm a senior in social

14   work.

15   Q     And --

16   A     For my bachelor's.

17   Q     I see.  Are you presently enrolled at

18   YSU?

19   A     No, not currently.

20   Q     I asked you in Interrogatory Number 13

21   to specify in detail the damages you claim

22   to have sustained as a result of the claims

23   you make in your lawsuit.  I'm

24   paraphrasing.

25   A     Sure.

1  Q    Including, but not limited to, an

2  itemization of each element of damage, along

3  with the dollar amount.

4       Now, the response I received as to the

5  dollar amount is "not yet determined," and I

6  understand that.

7       My real question relates to the

8  substantive answer you gave.  The answer you

9  gave was "emotional and psychological

10  damage, emotional distress, anxiety, PTSD,

11  nightmares and panic attacks."

12       It is true, is it not, that your

13  treatment records reflect that every one of

14  those conditions you suffered from prior to

15  your incarceration at Trumbull County in

16  2014?

17  A    Absolutely it does.  What I was

18  referring to in that statement, though, is

19  the acuteness and the frequency of my

20  symptoms that have substantially increased

21  since those events and during that time.

22  Q    So has any behavioral health specialist

23  told you that any of your emotional or

24  psychological conditions have become worse

25  as a result of your incarceration in 2014?

```
 1   A     Yes.  My counselor.

 2   Q     Who?

 3   A     My counselor Kim.

 4   Q     And Kim is a -- do you know what her

 5   credentials are as a behavioral health

 6   specialist?

 7   A     Let me take a look at her card for you.

 8   Q     That'd be great.  Thank you.

 9   A     It'll probably list it afterwards.

10   Q     Usually a lot of letters.  If you have

11   her card, if I can see it, I'd very much

12   appreciate it.

13   A     Sure.  Most of these are my -- you know

14   what, I don't have one for Kim; however, I

15   do have Valerie's and Valerie is my head

16   counselor I should say, so...

17   Q     Okay.  May I have your permission to

18   make a copy of this and I'll return it to

19   you at the break?

20   A     Absolutely.

21              MR. RASKIN:     I'm not going

22         to make it an exhibit, Sarah.

23   BY MR. RASKIN:

24   Q     Just so that I understand, though, did

25   Valerie tell you that your condition, any
```

Page 72

1    one of your emotional conditions has been

2    exacerbated subsequent to your incarceration

3    in 2014?

4    A    Yes, she and I have spoken about it.  I

5    don't see her with the frequency that I see

6    Kim.

7         However, like I said before, she does

8    oversee my entire file and I do still meet

9    with her, so it is something that we do

10   discuss.

11   Q    So maybe I need to be a little bit more

12   specific.  I'm not asking you what you have

13   reported.

14        I'm asking you whether or not any

15   behavioral health specialist has told you

16   that it is his or her diagnosis that any one

17   of your emotional or psychological

18   conditions have become worse since your

19   incarceration in the Trumbull County

20   detention facility?

21   A    Yes.

22   Q    Who?

23   A    Kim.  I would say Kim.

24   Q    Okay.  And that's Kim Russell?

25   A    Yes.

1    Q    All right.

2    A    And then if you would like, I'm sure

3    you can ask Valerie herself.  I'm sure

4    she'll be happy to give you her opinion.

5    Q    Now, did you counsel with Kim Russell

6    before you were incarcerated at the Trumbull

7    County detention facility in 2014?

8    A    No.  At that time, I was counseling

9    solely with Valerie.

10   Q    You did counsel with Valerie before

11   your incarceration in 2014?

12   A    Yes, I did, during my entire length of

13   treatment with Meridian.

14   Q    But, unfortunately, I don't have those

15   records, so it's a little difficult for me

16   to ask and review those things.

17        And if I asked you this question, I do

18   apologize, but -- no, I guess I didn't.

19   During what period of time did you counsel

20   with Meridian?

21   A    I counseled with Meridian from 2011 all

22   the way up until my incarceration, for that

23   entire length of time in 2013.

24   Q    So you were incarcerated in 2014?

25   A    Or '14.  I apologize.  I'm sorry.

```
 1   Q    It doesn't matter.  It's not a matter

 2   of your memorizing dates, but conceptually,

 3   I just want to understand.

 4        Is it your testimony that from sometime

 5   in 2011 until you actually were incarcerated

 6   on February 12th, 2014 in the Trumbull

 7   County detention facility, you continuously

 8   counseled with Meridian Services?

 9   A    That's correct.

10   Q    And during that time, your counselor

11   was Valerie Prevosnak?

12   A    That's correct.

13   Q    Did you have any other counselors other

14   than Valerie Prevosnak during the 2011 to

15   2014 time frame?

16   A    Yes, I did.  I attended another

17   specialized group through the agency that

18   was a women's rape crisis group, so I

19   attended that during that time as well.

20   Q    Was that a group therapy session?

21   A    It was.  There was usually three to

22   four of us.  It was a very intimate group.

23   Obviously the things being discussed, it

24   wasn't a large group.

25   Q    And who were the counselors?
```

1   A    At the time, there were two different

2   counselors who would run them.  I don't

3   recall their names at this time.  It's been

4   a while.

5   Q    Okay.  That's fine.

6   A    But it will definitely be in the

7   record.

8   Q    Now, just so that I'm clear, it's your

9   testimony that Valerie Prevosnak told you

10  that your mental health condition for which

11  you had been diagnosed was made worse as a

12  consequence of your incarceration in the

13  Trumbull County detention facility and the

14  events that occurred there?

15  A    Correct.

16  Q    Okay.  Have you incurred any expense

17  for your mental health treatment?

18  A    Currently all of that is covered by

19  insurance, so not personally.  My insurance

20  is covering it.

21  Q    What insurance is that?

22  A    I have CareSource.

23  Q    Okay.  Is that -- do you have that

24  through work?

25  A    No.

1    Q    So where did you get CareSource?

2    A    Through Job and Family Services.  I

3    applied for it for myself and my daughter.

4    Q    Is it fair for me to conclude that you

5    have not expended any of your own money at

6    all for any mental health or medical

7    services for conditions which you claim

8    occurred or were made worse as a result of

9    the events during your incarceration at

10   Trumbull County?

11   A    That's correct.  Everything has been

12   covered by insurance.

13   Q    Okay.  And from Trumbull County in 2014

14   when you were released, did you work?

15   A    No.  Well, wait.  I take that back.

16   Yes.  I worked during tax season for Liberty

17   Tax Service.  I worked for them, and that

18   was just, you know, a couple months and that

19   was it.

20   Q    And other than that, you didn't work?

21   A    No.

22   Q    But you were mentally acute enough so

23   that you could prepare other persons' tax

24   returns in 2014?

25   A    I worked just very few hours.  I would

1  go in just a couple days out of the week and

2  do returns for maybe four hours at a time.

3       It was something to kind of pull me out

4  of the house, something to try and give me

5  something good to focus on to get myself out

6  of myself.

7       So really at the time, that little bit

8  of work, it in a way helped me and my

9  stress.

10  Q    I appreciate that, but the answer to my

11  question, you were mentally acute enough to

12  be able to prepare other people's tax

13  returns in 2014, correct?

14  A    Yes.

15  Q    Thank you.  When I asked you in

16  Interrogatory Number 15 to provide me with

17  the names and addresses of your healthcare

18  providers, including psychologists,

19  psychiatrists, doctors, general

20  practitioners, et cetera, you gave me

21  Meridian Services, Townhall, Horizon House,

22  Northside Medical Center and Coleman

23  Counseling Services.

24       Any entity with whom you have received

25  services that is not included on that list?

1    A    No.

2    Q    Okay.  Thank you.  In Interrogatory

3    Number 21, I asked you to state the factual

4    basis for your allegation that Trumbull

5    County failed to respond to your complaints

6    regarding CO Drennen in a timely manner as

7    alleged in paragraph 26 of the lawsuit that

8    you filed.

9         Your response was "Trumbull County

10   failed to respond quickly to my complaints

11   regarding Drennen.  However, they

12   investigated quickly when Drennen made false

13   allegations against me."

14        The fact of the matter is you don't

15   know how quickly Trumbull County responded

16   to your complaints, do you?

17   A    Well, to my knowledge at the time,

18   Trumbull County hadn't given me any type of

19   response to my complaint.

20   Q    But I'm asking you now, as you sit here

21   today, you're here to testify about the

22   claims that you make in your lawsuit, and

23   the fact is you don't know how quickly

24   Trumbull County responded to your complaints

25   about former Corrections Officer Drennen, do

1  you?

2  A    Correct.

3  Q    But what you do know is that you were

4  interviewed on May 5th and you know also

5  that he resigned on May 13th, don't you?

6  A    Yes, I'm aware of that now.

7  Q    Thank you.  In Interrogatory Number 24,

8  I asked you the following question:  "Please

9  state the factual basis for your allegation

10  that Trumbull County knew or should have

11  known of Drennen's conduct as alleged in

12  paragraph 23 of your lawsuit."

13       You responded by saying, "Trumbull

14  County knew about Drennen's misconduct.  He

15  bragged to me and the other girls that he

16  had been investigated seven times before and

17  nothing happened to him.  He threatened to

18  make the rest of my stay difficult.  He and

19  other staff members followed through on that

20  threat.  I was frightened for my safety to

21  report the incidents and was punished and

22  treated poorly by other COs when I did

23  report."

24       That's a quotation from your answer.

25  A    Yes, that is absolutely correct.

Page 80

1    Q    Now, can you tell me the source of your

2    information that Mr. Drennen was

3    investigated seven times?

4    A    Sure.  Mr. Drennen himself said that to

5    me.

6    Q    Have you ever seen any documents which

7    corroborate your statement that Mr. Drennen

8    had been investigated seven times?

9    A    No, I do not.  The only information I

10   had was him stating that as a fact to myself

11   that evening.

12   Q    But, of course, you didn't say that in

13   your interrogatory answer.  What you said

14   was that he had been investigated seven

15   times and nothing happened to him, and that

16   isn't information that you can swear is

17   accurate, is it?

18   A    No.  I can only accurately say that CO

19   Drennen that evening, upon me asking him to

20   please not engage in a sexual type behavior

21   with the next young girl that came into the

22   pod, his response at that time to me was

23   that if I didn't want the rest of my stay in

24   the Trumbull County Jail to be an

25   uncomfortable one, that I wouldn't say

1  anything because he had previously already

2  been looked into a number of times for

3  improper behavior with female inmates and

4  that nothing had come of it.

5      At that time, I took that statement, as

6  I assume anyone would, as a direct threat,

7  and it is correct to say that after staff

8  was made aware of the situation, the fears

9  that I had had initially not wanting to

10  report this all came true, okay.

11      After I reported this to staff, to the

12  head staff, there was no reason, in my

13  opinion, for lower staff to have all been

14  made aware of the situation at hand.  If you

15  ask me, that's something that should have

16  stayed in whose laps it had landed.

17      After that, they refused us basic

18  items.  We were refused cleaning products

19  during the day.  We were refused toilet

20  paper and feminine products.

21      There was one sergeant in particular

22  who would come across our intercom boxes any

23  time a male officer was coming through for

24  rounds and say things like, "Well, you

25  better not talk to any of those girls, they

1    might try and say you're trying to sleep

2    with them."

3          I mean, I had to spend a length of time

4    in there and, I'm sorry, but I didn't

5    deserve that type of treatment, and the

6    treatment that I received was the exact kind

7    of treatment that I didn't want to happen if

8    I had reported it to begin with, and --

9    sorry.

10          To answer your question shortly, yes,

11    that's exactly what happened.

12    Q    Okay.  My question I think was a little

13    bit different than that, but let me make

14    sure that I ask you the question and you

15    respond to the question that I'm asking.

16          What I asked you was of your own

17    knowledge, you cannot swear under oath that

18    Corrections Officer Drennen was investigated

19    seven times or any other times for similar

20    conduct that you complained about, correct?

21    A    Correct.

22    Q    Now, you also said -- strike that.  Do

23    you need to take a moment?

24    A    No, I'm okay.

25    Q    Are you sure?

Page 83

1   A     Yeah.

2   Q     Because we can take a break.

3   A     Okay.  Yeah, can I take a break,

4   please?

5   Q     Absolutely.

6              MR. RASKIN:    As a matter

7         of fact, it's 10 minutes to 12:00.

8         Why don't we take a lunch break?

9                   - - -

10      (Discussion had off the record.)

11                  - - -

12  BY MR. RASKIN:

13  Q     Now, you responded to one of my

14  earlier questions by telling me that you

15  felt that certain other corrections

16  officers, after the report concerning former

17  Corrections Officer Drennen, treated you

18  badly and you made mention of a sergeant.

19      Do you have the identity of any

20  corrections officers that you can provide to

21  me that you claim treated you poorly as a

22  consequence of reporting your complaints

23  about former Corrections Officer Drennen?

24  A     The officer who would often come across

25  the intercoms to us at the time was Sergeant

1    Mary.  I don't know her last name.

2    Q    Sergeant Mary.  Okay.

3    A    First shift workers are the ones in

4    charge of giving us the cleaning products in

5    the morning, providing us with toiletries,

6    things of that nature.

7         It was during those shifts that we were

8    denied those items, so often we would have

9    to wait till second or third shift workers

10   and request them to be brought in, and

11   because they're supposed to be given to you

12   first shift, a lot of times, you know, they

13   would deny your request because you're

14   supposed to get them during first shift.

15   Q    So are you telling me that -- you said

16   toiletries and cleaning products?

17   A    Yes.

18   Q    Cleaning products for the cell?

19   A    Yes.  Normally you're supposed to every

20   morning --

21   Q    Or the pod rather?  According to the

22   timeline that we talked about, you -- this

23   was reported on May 4th of 2014, you

24   remained incarcerated through August, but in

25   the middle of August of 2014.  Are you

Page 85

1    telling me that you did not receive any

2    cleaning products for that entire period of

3    time?

4    A    The period of time that I remained in

5    Trustee Pod, there were, in fact, some days

6    that certain first shift officers and

7    sergeants would be working that we would

8    receive them.  So to answer it, no, not for

9    the entire length of the time.

10   Q    And how about toiletries, same

11   question?

12   A    Same answer, not --

13   Q    So you received toiletries for your

14   personal use, you received cleaning products

15   for your personal use, but not at the same

16   frequency as before the report; is that your

17   testimony?

18   A    And not when -- I would say and not

19   when needed.  There were periods of time

20   when we necessitated toilet paper, feminine

21   products and we were just told no, and left

22   to our own devices.

23   Q    I'm not asking about "we."  I'm asking

24   about you.

25   A    Myself, sure.  Myself, yes.

Page 86

```
 1    Q      Because you're one of the two
 2    plaintiffs in this case.
 3    A      Yes.
 4    Q      And did you write a kite to report the
 5    transgressions that you just described for
 6    me?
 7    A      I'm glad that you asked this question
 8    because this is what I had made reference to
 9    earlier.
10           When we would express to officers --
11    when I would express to officers on other
12    shifts the reason why I was asking for
13    cleaning products, toiletries, things of
14    that nature, and they would say, "Why didn't
15    you get them on first shift," I would tell
16    them I didn't get them on first shift
17    because even though we requested them, we
18    were denied those products.
19           When I asked for a kite to report this
20    problem, none of the corrections officers
21    that I asked for the kites, none of them
22    wanted to involve themselves in the
23    complaint.  I was denied kites because
24    corrections officers, I guess my assumption
25    would be, did not want to be linked to the
```

1    issue at hand.

2    Q    What is the name of the corrections

3    officer or officers from whom you requested

4    the kites that wouldn't provide them?

5    A    I can't remember.  I asked a number of

6    corrections officers during that time.  I

7    can't remember a particular one.

8    Q    As you sit here today, can you give me

9    the identity of any corrections officer

10   employed at the Trumbull County detention

11   facility who you asked for a kite from and

12   who refused it, to give it to you?

13   A    No, not in particular.  The response

14   that I would get during that time when I

15   would ask for the kites, rather than wanting

16   to give me the kite for the complaint, they

17   would just want to go and get the items that

18   we were asking for in lieu of putting their

19   name on the kite and giving it to me.

20   Q    And did you get the items that you were

21   asking for then?

22   A    At that time, yes.  In lieu of giving

23   me the complaint, they would give me the

24   cleaning products or that.

25         But I think the important part of this

1   is that I didn't get them when they were

2   necessary.  I mean, if you have to use the

3   restroom at noon and you have no toilet

4   paper, it doesn't help that you get it at

5   6:00 p.m.

6   Q    In Interrogatory Number 24, I asked you

7   to state the factual basis for your

8   allegation that Trumbull County knew or

9   should have known of Drennen's conduct as

10  you allege in paragraph 23 of your

11  Complaint.

12       You told me that he had told you that

13  he had been investigated seven times, but

14  that you had no other source for that

15  information apart from what Drennen told

16  you?

17  A    Correct.

18  Q    All right.

19  A    I will say as well, just to add to that

20  a little bit, that in addition to that, as

21  often as Katie would speak to and flirt with

22  and talk with Corrections Officer Drennen on

23  the intercom system, I find it very

24  difficult to believe that at no time did the

25  other officers whom he was working with

Page 89

 1    during his shifts not hear the conversations

 2    going on between the two of them.

 3         So in addition to what CO Drennen said

 4    to me himself, I just find it very hard to

 5    believe that for the frequency that this

 6    type of behavior went on, that his

 7    co-workers who worked the entire shift with

 8    him were never made aware of his type of

 9    behavior with female inmates.

10    Q    What was the frequency?

11    A    From what I experienced, every shift

12    that he worked during midnight rounds.

13         He and Katie would talk with one

14    another and flirt with one another and have

15    their little code words with one another

16    when he wanted notes from her or when he

17    wanted her to expose herself to him.

18    Q    How often did Ms. Sherman expose

19    herself to Mr. Drennen?

20    A    On a number of occasions.

21    Q    I know you know what that means, but I

22    can't jump inside your head.

23    A    Sure.

24    Q    So what I'm interested in is how often

25    and when?

Page 90

1   A    Sure.  How often would be during his

2   shifts.  Not during all of his shifts would

3   she expose herself to him, but I would say

4   at least on four or five occasions that I,

5   myself, you know, not sleeping at the time

6   had witnessed.

7   Q    So you witnessed four or five times

8   when Ms. Sherman exposed herself to Mr.

9   Drennen while he was working and on rounds?

10  A    Correct.

11  Q    And that's during the approximate

12  two-month period of time when both you and

13  Ms. Sherman were incarcerated together?

14  A    Correct, and that's --

15  Q    Actually strike that.  I misspoke and I

16  apologize.  I don't want to mislead you.

17  A    Okay.

18  Q    I believe that you were actually, you

19  tell me if I am wrong about that, but it is

20  my impression that you were incarcerated

21  together for approximately three months?

22  A    Correct, but during a portion of that

23  time, Katie and I were not housed in the

24  same unit, so that length of time is a

25  little bit smaller.

1  Q    All right.  So for how many days, weeks

2  or months were you and Ms. Sherman in the

3  same pod?

4  A    I would say approximately two that we

5  were in there together.

6  Q    Okay.  And so over a 60-day period

7  during which you and Ms. Sherman were housed

8  together in the same pod, it's your

9  testimony that four to five times Ms.

10  Sherman exposed herself to Mr. Drennen while

11  you were awake and observing it?

12  A    Correct.  And that -- not just limited

13  to exposing herself, but there were also

14  other instances where when he would come,

15  where they hit their call button to report

16  that they had made their round was located

17  right next to Katie's bunk, and so, I mean,

18  too many times to count, he would stand

19  there pushing the button beside her bed and

20  say things to her -- like she would put on

21  super-tight shirts or roll her shorts all

22  the way up, and he would stand by her bed

23  and tell her how hot she was and how sexy,

24  and he would make comments to the effect of

25  how hard his dick was and "How am I going to

Page 92

1  walk around work all night long with my

2  pants like this," and just all these sexual

3  comments.

4       So even during times when Katie wasn't

5  exposing herself to him, they were engaged

6  in a lot of just sexual talk and behavior

7  with one another.

8  Q    Where was your bunk physically in

9  relation to Ms. Sherman's?

10 A    My bunk was physically right next to

11 her.  So even if I turned my head to not see

12 what's going on, I'm still listening to

13 everything that's going on.

14 Q    Right.  And tell me what you actually

15 saw on the four or five occasions that you

16 claim that Ms. Sherman exposed herself or

17 engaged in other activities at the request

18 of Mr. Drennen.

19 A    Sure.  On three to four of those

20 occasions, it was Katie exposing her breasts

21 to him and/or touching them, rubbing them.

22      On one particular occasion, she had

23 removed her shorts underneath her blanket

24 and then arranged herself so that when he

25 came in, she was, you know, masturbating for

1  him, which was something that he had alluded

2  to and requested during prior rounds.

3  Q    And you heard him request that?

4  A    Yes.  Request it in their code.  He

5  would speak to her a lot of times, and I'm

6  sure this had to do with -- I know

7  occasionally staff supervisors will listen

8  in on call boxes and radios.  I think it's

9  probably just part of their policy would be

10  my guess.

11      But, like, Katie would write him notes,

12  and stuff, and he would always come in

13  during rounds and he'd say things to her

14  like, "So, you have any visitor's lists for

15  me tonight," meaning hey, are you going to

16  write me any notes tonight and stuff.

17  Q    So how'd you know that that's what that

18  meant?

19  A    Well, because Katie -- well, initially

20  Katie had wrote him a note at one point in

21  time and she had told him, "Hey, I have a

22  visitor's list for you," and I'm winking for

23  the record when I said that.

24      And then after that one instance of her

25  writing him the note, then when he would

Page 94

1    come in after that, he would always request

2    them, you know, "Are you going to have any

3    visitor's lists for me tonight," or he would

4    say, "Do you need to add anyone to your

5    visitor's list tonight," and other than just

6    that -- like I said earlier, first shift is

7    in charge of giving us our cleaning

8    supplies, broom, mop, buckets, cleaning

9    stuff.

10        At the end of first shift, all of that

11   stuff is put away, so he would go and say to

12   us -- or not say to us.  I apologize.

13        He would come in and say to Katie when

14   he would want her to expose herself to him,

15   he would say things about, "So you need me

16   to go put that mop handle away for you," or

17   "You need me to go put the broom handle away

18   for you," and, I mean, occasionally once in

19   a blue moon if we had a spill or an accident

20   or something, somebody would bring in the

21   mop stick for us and it would get left in

22   the pod.

23        So Katie can probably recall better

24   than I can how the whole broomstick thing

25   got started, but then it became, just like

1  the visitor's list, it just became this

2  recurrent thing all the time him requesting

3  these things from her.

4      I mean, I'm right next to you, you

5  know.  I mean, if you are -- not that it

6  would make it right, because it absolutely

7  wouldn't be right, but this isn't just one

8  person you're engaging with.  You have all

9  these other girls who are in here and you're

10  not being quiet about it.

11      You know that people aren't sleeping

12  and you're putting yourself out there in all

13  these sexualized comments and you're egging

14  this young girl on who is young enough to be

15  your daughter and asking her to do things to

16  herself, and not just do things to herself

17  for you, but to do things to herself in

18  front of other girls.

19      Like Katie knows this, I love Katie and

20  I think a lot of her, and I was just

21  embarrassed for her.  Like nobody should be

22  put in a position like that, especially not

23  in a place like that, and...

24  Q    Did Mr. Drennen ever ask you to engage

25  in any of the acts you just described?

1    A    No.

2    Q    And you never did?

3    A    No.

4    Q    So you've told me that over the course

5    of 60 days, there were three or four

6    occasions where Katie Sherman exposed her

7    breasts for Mr. Drennen to see, and on one

8    occasion, you can remember she removed her

9    shorts underneath her blanket and

10   masturbated for him?

11   A    Correct.

12   Q    Have I correctly summarized your

13   testimony?

14   A    Correct.

15   Q    Any other incidents apart from what you

16   described?

17   A    No, not physically.

18   Q    So you said, "No, not physically," so

19   I guess that leads me to ask, are you

20   talking about there might have been some

21   additional verbal exchanges?

22   A    Exactly.

23   Q    But in terms of what Katie Sherman did

24   in Mr. Drennen's presence, you have

25   described a total of between four and five

1    incidents and described what they were in

2    response to my earlier questions, correct?

3    A    Correct.  And there may be -- I mean,

4    Katie will have to tell you that, but there

5    may be more instances than that, but those

6    are the ones that I was awake for and

7    present to.

8    Q    Well, your claim is that you were awake

9    and were -- I don't want to use the word

10   exposed, but that you saw these events,

11   correct?

12   A    Correct.

13   Q    So what we're talking about, in so far

14   as your claim, is four to five distinct

15   events --

16   A    Correct.

17   Q    -- over a period of 60 days?

18   A    Exactly.

19   Q    I see.  Was there an incident that

20   occurred in the detention facility on May

21   6th, 2014 and in particular, in C Pod, for

22   which you were disciplined?

23   A    Not that I recall.  In C Pod?

24   Q    C Pod.

25   A    No.  I was only housed in C Pod for a

1   short period of time initially when I was

2   first in there.  Are you sure that's mine?

3   Q    What pod were you in when you claim

4   that Mr. Drennen engaged in the conduct you

5   just described?

6   A    Trustee Pod.

7   Q    Trustee Pod?

8   A    Correct.

9   Q    Was there an incident in the Trustee

10  Pod on May 6th, 2014 for which you were

11  disciplined?

12  A    Oh, I know.  I think I know.  Yes.

13       One night we were having Late Night

14  Dinner Theater, us girls.  It sounds stupid,

15  but us girls would act out plays out of

16  boredom and we got in trouble because we

17  made ties, like what you have on, out of our

18  socks and had drawn monocles on our faces.

19       We were just goofing around, but we got

20  written up because of horseplay, because we

21  were horsing around, for contraband for

22  turning our socks into neckties and lock

23  strings into hair pieces.  I know it sounds

24  ridiculous and embarrassing, but...

25  Q    I'm think this isn't exactly the same

1    incident.

2    A    Okay.  That's the only disciplinary

3    report I received.

4    Q    Well, I'm looking at a report dated May

5    6, 2014 at 1:39.  Apparently that's when the

6    incident occurred, 0139, and in particular,

7    the corrections officers entered the third

8    floor Trustee Pod to find toilet paper

9    strung up from the phones to the first set

10   of bunks with "Caution Crime Scene,"

11   quote/unquote, written across it.

12         Inmate Della Workman was laying in

13   inmate Michele Rafferty's bunk and inmate

14   Rafferty and Tania Cordwell were standing in

15   the middle of the pod over a chalk-out line

16   of a person on the floor.

17         Inmate Rafferty had a strand of mop

18   tied to a towel and was wearing it as a

19   cape.  Inmate Cordwell had a strand of a mop

20   tied around her neck attached to a sock,

21   wearing it as a necktie.

22         Both inmates Rafferty and Cordwell had

23   drawn things all over their face, and all

24   three of you lost commissary and visitation?

25   A    Yes.

1    Q    And this was horseplay, right?

2    A    Yes.

3    Q    You were joking around?

4    A    Yes.

5    Q    And this was immediately after you had

6    reported the conduct of former Corrections

7    Officer Drennen, wasn't it?

8    A    No, that was not the same night.

9    Q    I didn't say the same night.  It was

10   the next day?

11   A    I don't think it was the next day.

12   Q    Well, this is May 6th.

13   A    I don't think it was.  I mean, if

14   that's what it's dated, that's fine.

15   Q    So whatever trauma you experienced

16   didn't prevent you from horseplaying and

17   having fun in the pod?

18   A    Well, I mean, during a time like that,

19   what else do you do?  I mean, under the

20   circumstances, what do you do?

21        You're locked up in a room, to be

22   honest, not much bigger than this one at

23   all, with six girls, 24 hours a day.

24   Q    Well, you're not blaming anyone other

25   than yourself for being locked up in jail,

1   are you?

2   A    Oh, absolutely not, no.  I'm saying

3   under the conditions -- I mean, us girls

4   would try and find ways to amuse ourselves.

5   Q    Do you have any personal knowledge of

6   the training that former Corrections Officer

7   Drennen received?

8   A    No.

9   Q    You don't know whether or not he

10  attended and completed corrections officer

11  training school, do you?

12  A    No.

13  Q    You don't know whether or not he was

14  also a commissioned law enforcement officer,

15  do you?

16  A    No.

17  Q    So when you allege in your lawsuit that

18  his training was deficient, that isn't as a

19  result of any knowledge that you personally

20  have, is it?

21  A    Correct.

22  Q    Now, you make certain allegations

23  against Eric Shay in your lawsuit.  Do you

24  know actually what Eric Shay's position was

25  in the Trumbull County detention facility

1    during your incarceration in 2014?

2    A    Jail administrator.

3    Q    And how do you know that?

4    A    Because when there would be notices put

5    up throughout the jail with his name, it

6    would say underneath "Jail administrator."

7    Q    Do you know what his responsibility

8    was, if any, for the supervision of former

9    Corrections Officer Drennen?

10   A    I can only assume that he oversaw --

11   okay, no.

12   Q    I'm not asking you to assume.  I want

13   to know what you know, not what you think or

14   what you're assuming, okay?

15   A    Okay.

16   Q    During the events which you described

17   occurring over a two-month period, the four

18   or five events that we've already talked

19   about, do you know whether or not Eric Shay

20   was actually on duty any of those nights?

21   A    No, I do not.

22   Q    Do you know who the officer in charge

23   of the shift was any of those nights?

24   A    No.

25   Q    And you didn't ask to speak to the

1    officer in charge of the shift on any of

2    those occasions when Ms. Sherman engaged in

3    the conduct that you've described in

4    response to my earlier questions, correct?

5    A     No.

6    Q     Does correct mean yes?

7    A     Oh, I'm sorry.  Yes, correct.

8    Q     Okay.  Thank you.  You claim in

9    paragraph 24 of the lawsuit that you filed

10   that Mr. Drennen would employ bribery to

11   entice female inmates to perform for him and

12   that he conducted illegal strip searches of

13   Ms. Sherman and others.

14        Thus far, all you have described for

15   me, and I don't mean to minimize it.  Please

16   don't read into my question.

17   A     Sure.

18   Q     But thus far all you have described for

19   me are four or five occasions when Ms.

20   Sherman either exposed her breasts on three

21   or four of those occasions or masturbated on

22   one of those occasions.

23        Is it your testimony that other female

24   inmates engaged in similar conduct at Mr.

25   Drennen's request?

1    A    Yes.

2    Q    Who?

3    A    Jessica Friend.  When I was in C Pod --

4    prior to my being housed with Katie, I was

5    initially put in C Pod.  At the time, they

6    were overcrowded and I was housed on the

7    floor in bunks and there was a number of us

8    girls who were housed there in bunks.

9         I wasn't feeling well at the time, so I

10   wasn't doing much sleeping, and Jessica

11   Friend's bunk was just about two down from

12   mine and it was the exact same -- exact same

13   behavior that I was about to see happen with

14   Katie in Trustee Pod.

15        Officer Drennen would frequently make

16   it a point to stop and -- stop by Jessica

17   Friend's bunk on the floor and make

18   conversation with her.  When he would --

19   when she could see that he was there for

20   rounds, she would go and take off her bra

21   and her panties and put on these really thin

22   see-through thermal outfits, or she would do

23   the same thing, roll her shorts all the way

24   up and put on really tight shirts, no bra,

25   and that, and she would sit there at her

1  bunk and flirt with him or, you know, walk

2  back and forth to the bathroom so that you

3  could just see her bouncing all over the

4  place.

5       And at one point in time, Jessica was

6  released and it was only for a couple of

7  days, three or four days maybe, before she

8  was brought back in.

9       Now, when she came back in, she started

10 telling me how during the few days that she

11 was home, and this is just what she told me,

12 I will say this.  I do not know what type of

13 vehicle Officer Drennen drives or did drive

14 at the time, or anything that she told me,

15 but she told me that during the few days she

16 was home, he would drive by her home in his

17 white truck numerous times a day and that he

18 had even gone so far as to calling her at

19 her home, and at one point during a phone

20 conversation to her at her home, he

21 questioned her as to whose cars were in the

22 driveway because he had noticed that there

23 was a car there that he didn't usually see

24 there.

25       It was at the same time, I'll note,

1  that Jessica wasn't receiving any money from

2  her family or anyone, and then one day

3  received a money order and she had made

4  mention to us when she received the money

5  order, "Oh, my gosh, who is this from?"

6  There was no name or anything on it.

7       She was, like, "I wonder who this could

8  be from," and then when Officer Drennen had

9  worked next, he came and stopped by her

10  bunk, which I heard because I was right by

11  her, he stopped and was, like, "Oh," I see

12  you got some money on your books.  Isn't

13  that really great," which you could tell by

14  the way he was speaking to her he was

15  alluding to the fact that he had sent the

16  money.

17       These are things that I, myself, heard

18  and witnessed prior to my ever being housed

19  with Katie.

20       Now, at one point, I will say, and I

21  believe in the statement, that I heard CO

22  Drennen make -- I believe that this is what

23  he was referring to at one point.

24       At one point, Jessica Friend got moved

25  over into Trustee Pod where Katie and I

1  were, and for a short time, you could tell,

2  and Katie can better explain it, I'm sure,

3  you could cut the tension in the pod with a

4  knife because now you have two girls who

5  were previously held in separate pods who

6  he's engaging in this behavior with are now

7  housed together, and so it created just a

8  very tense, uncomfortable environment, and

9  in CO Drennen's statement, which I will say

10  the way he stated it is incorrect.

11       He said that -- I want to say it

12  correctly.  I wish I had a transcript.  He

13  says, "The girls said that I should thank

14  them for smoothing things over for me," and

15  I believe what he's referring to is Katie

16  and Jessica being housed together, and

17  although it was nothing that I said, there

18  was a point in time that one of the other

19  inmates in the pod had made mention to

20  Corrections Officer Drennen, "Boy, what are

21  you going to do now?  This sure is

22  uncomfortable.  You have your two favorite

23  girls in here together."

24  Q    Did you report the conduct between

25  Jessica Friend and Officer Drennen to any

1   member of the Trumbull County

2   administration?

3   A     No, I did not.

4   Q     Did you report the conduct between

5   former Corrections Officer Drennen and Ms.

6   Friend to any other ranking corrections

7   officer at all?

8   A     No.

9   Q     Are you aware that Ms. Friend denies

10  the allegations you make?

11  A     Yes.

12  Q     And you don't have any personal

13  knowledge of who put money on her books, do

14  you?

15  A     No, I do not.  I only know what I

16  heard.

17  Q     Well, you know what you assume from

18  what you heard, correct?

19  A     I mean, what he said and his body

20  language.  I mean, if I say something to you

21  how I am now, it'd be hard to decipher, but

22  when someone is making body motions and

23  facial expressions in a way that is alluding

24  to the fact that there is more to what

25  they're saying -- I mean, he didn't have to

1    come right out and say that he sent it.

2        If you would have been there to see the

3    way he approached her, and secondly, there

4    is no reason for him to have had knowledge

5    that she received a money order unless he

6    was the officer who was handing them out the

7    night that we received it -- which she

8    received it, which he, in fact, was not.

9        So one of two things had to have

10   happened, either he was looking into her

11   personal file unnecessarily, or he sent the

12   money order, which he alluded to, in my

13   opinion.

14   Q    Did you actually hear former

15   Corrections Officer Drennen say that he had

16   put money on her commissary account?

17   A    No.  I heard him say he knew that money

18   had been placed on her account and he

19   alluded to the fact that it was himself that

20   sent it.

21   Q    Well, "alluded to," that was your

22   interpretation of what you heard?

23   A    Absolutely it was.

24   Q    Are you aware that on May 7th, Major

25   Stewart questioned Jessica Friend while she

1    was at NEOCAP and she completely denied all

2    of your accusations that were made about

3    herself and stated that he never sent her a

4    money order for her books and never harassed

5    her while he was working with the Vienna

6    Police Department?

7    A    Yes.

8    Q    Are you aware that according to Jessica

9    Friend, she told Major Stewart that the

10   blank money order with no name came from a

11   source that goes by the name of Joe and he

12   didn't want his name on record as giving her

13   money?

14   A    Yes, I am aware of that.

15   Q    And you're aware that this interview

16   was -- well, you may or may not be aware

17   that this interview was audiotaped?

18   A    Yes.

19   Q    Okay.  So, in any event, this

20   relationship, if you will -- well, strike

21   that.

22        This conduct which you claim to have

23   occurred between Jessica Friend and former

24   Corrections Officer Drennen was denied by

25   her, wasn't it?

1   A    Correct.

2   Q    Thank you.  Did you at any time ask

3   former Corrections Officer Drennen for

4   cigarettes and a lighter?

5   A    No, I did not.

6   Q    So you claim that his report -- well,

7   strike that.

8        Were you in the presence of Tania

9   Cordwell when she asked Corrections Officer

10  Drennen for cigarettes and a lighter during

11  razors in order to be quiet about what you

12  and she claimed to be his conduct involving

13  Katie Sherman?

14            MS. KOVOOR:    Objection.

15        Vague.  I'm not understanding what

16        you're asking.  I don't know how she

17        could.

18            MR. RASKIN:    Well, I guess

19        if you don't understand it --

20  BY MR. RASKIN:

21  Q    Did you understand it?

22  A    I think I can make this real clear for

23  you.

24  Q    No, no, don't make it real clear.  I'll

25  rephrase the question.  If it was that bad a

1    question, I apologize.

2         You're aware that on May 4th,

3    Corrections Officer Drennen wrote an

4    incident report?

5    A    Yes.

6    Q    And you're aware that the subject of

7    that incident report was that he claimed

8    that you and Ms. Cordwell had done him a

9    favor by controlling the other girls in the

10   pod who were jealous of his relationship

11   with Katie Sherman, and in return for your

12   silence and the control that you had

13   exerted, you were asking him for cigarettes

14   and a lighter during razors?

15   A    It is correct that I understand that

16   that is what he said, yes.

17   Q    Okay.  Do you deny that either you or

18   Ms. Cordwell said that to former Corrections

19   Officer Drennen?

20   A    That is not a correct statement.

21   Q    So let me read the statement to you now

22   that I can get my hands on it, and I want

23   you to tell me if any of it is true.

24   A    Sure.

25   Q    And if yes, what is true, and

1   otherwise, what isn't.

2   A    Okay.

3   Q    It says that on 5/4/2014 at 2:30 a.m.,

4   this reporting officer, Drennen, had just

5   finished a full watch tour while working

6   Tower 3 and was on my way to 3T 101 door to

7   exit when inmates Michele Rafferty and Tania

8   Cordwell stopped me and asked, quote, "'so

9   how's your girlfriend doing," unquote.

10       I then replied, "What are you talking

11  about?"

12       Rafferty said, quote, "Katie."  Again I

13  said, "Katie who, and again, what are you

14  talking about?"

15       Rafferty said "Katie Sherman.  She

16  really liked you."

17       I replied, "You're out of your F'ing

18  mind and you couldn't pay me to date an

19  inmate."

20       They then said, quote, "There were

21  girls in the pod that got really jealous

22  when Katie would talk about you all the

23  time, but me and Tania smoothed it over for

24  you and all we're asking is during razors or

25  sometime you could drop us some cigarettes

1 and a lighter because we helped you out on

2 this and that's the least you can do."

3 　　　At this time, this reporting officer

4 became very irate and stated "That's never

5 going to happen."

6 　　　They replied "If you don't do this, we

7 could get everybody to say you were making

8 girls strip or trying to get them to have

9 sex with you again."

10 　　　This reporting officer replied, "Never

11 F'ing going to happen" and this reporting

12 officer exited the pod.

13 　　　This reporting officer told CO O'Brien

14 and while she had the intercom on, she could

15 not hear anything.  I also told CO Green

16 while the two officers, Green and O'Brien,

17 were on the pod phone.

18 　　　This reporting officer then contacted

19 Sergeant Tomko, met him downstairs where I

20 explained the incident to him and Sergeant

21 Tomko instructed this reporting officer to

22 make this incident report.

23 　　　That is the totality, and I apologize

24 for the length of reading it to you, but it

25 is my assumption, you correct me if I'm

1   wrong, that you've seen this before today?

2   A     Yes, I have seen that.

3   Q     All right.  So did you and Ms. Cordwell

4   say anything to former Corrections Officer

5   Drennen that he described in his incident

6   report or summary report of May 4th?

7   A     No, none of that report is accurate.

8   Q     The whole thing is untrue?

9   A     The entire thing is inaccurate.  What

10  happened was when -- initially, and I'll say

11  this, initially they did first round head

12  count, which is not done by the officers who

13  are working the floor that evening.  They're

14  done by what they call usually your roving

15  officers.

16       So head count was done for the evening,

17  and that's usually done at 11:00 or 11:30.

18  During CO Drennen's first round, the girls

19  in the pod -- I mean, we had all discussed

20  this, that not just myself was fed up with

21  seeing what was going on, but so were the

22  other girls, and we decided, you know, a

23  little solidarity in numbers, when he came

24  through, we decided we're just going to stop

25  him, we're going to let him know, like,

1   please, the next young girl that comes in

2   here, we just don't want to see this go on

3   anymore from here on out, please.

4       So when he did his first round that

5   night, us girls were all awake and we tried

6   stopping him, saying, you know, "Drennen,

7   can we talk to you for a second, something

8   we want to talk to you about," and CO

9   Drennen, by the look on his face, looked

10  uncomfortable and brushed us off and left

11  his round.

12      So, I mean, it started to get late in

13  the evening, obviously, so some of the girls

14  had fallen asleep and Tania and I were still

15  awake.

16      So when Mr. Drennen came through for

17  his next round, which was later, early in

18  the morning, I had stopped him as he was

19  doing his tour and I said to him, I said,

20  "Look," I said, "this stuff that had been

21  going on with Katie," I said, "we just don't

22  want to see that happen anymore."

23      That was it.  It was a simple request.

24  It was saying Hey, we don't like what's been

25  going on.  Can it please just stop?

1      I mean, it could have been so simple.

2   It could have been an "I am sorry" and just

3   -- it could have just not happened anymore,

4   but after that simple request was when he

5   turned around and, like, squared up, looking

6   me directly in my face and proceeds to tell

7   me, as I said earlier, that if I didn't want

8   the rest of my stay there to be an

9   uncomfortable one, that I -- I should say

10   this better.

11      We said that I really wanted the

12   behavior to stop and that if it didn't stop,

13   I was going to have to report it was what I

14   had said to him.

15      At that time was when he had told me

16   that I wasn't going to report it to anybody

17   because if I didn't want the rest of my stay

18   there to be an uncomfortable one, that I

19   wouldn't say anything at all.

20      Now, I will say that Tania Cordwell

21   piped up as he was exiting and called him

22   some expletive name and said something to

23   the effect of -- called him, excuse my

24   language, but called him an asshole and said

25   that the least he could have done was tossed

1    us and "here's some cigarettes," or

2    something, for making us bear witness to his

3    behavior is what she had said.

4         I had nothing to do with what she

5    said.  I mean, I wouldn't have called him an

6    asshole either to his face like that in that

7    type of position, but that's what was said

8    and that's the truth of the matter.

9    Q    You claim that Sheriff Altiere and/or

10   Lieutenant Shay knew or should have known of

11   Drennen's pattern of sexual misconduct and

12   exploitation of female inmates.  How is it

13   that they should have known that?

14   A    I was in there at this time for a very

15   short period of time, and in that short

16   period of time, I got to not only witness in

17   not just one female housing area, but two

18   female housing areas, just myself in that

19   short time, the type of behavior and the way

20   he acted toward female inmates, and in

21   addition to that, when I moved to the only

22   other girls' housing area, there were female

23   inmates who talked about how he would engage

24   in the exact, and when I say "exact," I mean

25   exact type of behavior with females in that

1    housing pod, and if I had only been there

2    two months and had seen everything that I

3    had seen and heard everything that I had

4    heard, I find it very hard to believe that

5    he had worked there for any length of period

6    of time and his co-workers and supervisors

7    not be privy to what was going on.

8    Q    Of your own knowledge, you don't know

9    that anyone, inmate or otherwise, ever

10   reported to jail administration that CO

11   Drennen was engaging in any inappropriate

12   acts towards female prisoners, do you?

13   A    You're asking if I knew that jail staff

14   knew?

15   Q    Let me ask it again.

16   A    Okay.  Sorry.

17   Q    Of your own knowledge, you don't know

18   that anyone ever reported to jail

19   administration that CO Drennen was engaging

20   in inappropriate acts towards female

21   prisoners, do you?

22   A    No, I do not.

23   Q    Thank you.  And to be clear, since you

24   have sued Sheriff Altiere and Lieutenant

25   Shay, let me ask that question slightly

Page 120

1    differently.

2    A    Okay.

3    Q    You don't know of your own knowledge

4    that anyone ever reported to Sheriff Altiere

5    that CO Drennen was engaging in improper or

6    inappropriate conduct towards female

7    prisoners, do you?

8    A    No.

9    Q    You don't know of your own knowledge

10   that anyone ever reported to Lieutenant Shay

11   that CO Drennen was engaging in

12   inappropriate conduct towards female

13   prisoners, do you?

14   A    No.

15   Q    Thank you.

16   A    Can I add in something here?  I know

17   you haven't asked me a question about this,

18   but I feel like it's pretty important that I

19   add it in.  Is that okay?  I'm sorry.

20   Because I feel like a lot of your questions

21   have to do about the reporting of these

22   types of instances and I feel this is really

23   important.

24        When I -- I told you that I feel the

25   kiting system could use a little

Page 121

1  improvement, to say the least, but my

2  experience in the Trumbull County Jail with

3  policy and procedure when it comes to

4  reporting instances like this and my

5  experience when I was in Marysville with how

6  we are educated and the available options

7  for reporting these types of incidents were

8  just polar opposites.

9      At Marysville, we watched a video, we

10  were educated on how -- what constituted

11  PREA, how we could report it safely, how we

12  could report it anonymously with it getting

13  to the right people, eliminating the fears

14  that I had about reporting it through a kite

15  system.

16      At no point when I was in Trumbull

17  County Jail was I given a handbook, was I

18  educated on the point of if something like

19  this were to happen, this is how you can

20  safely report it, this is who you can safely

21  report it to, and this is what you can

22  expect to happen after you report it.  None

23  of that was made available.

24      None of that -- we weren't educated on

25  any of that.  None of those options were

Page 122

1    available to me.  Believe me when I tell

2    you, if the type of options and education

3    was available to me that I received at

4    Marysville when I was in Trumbull County,

5    reporting what was going on would have been

6    no problem at all.  It would have been a

7    safe environment and you would have felt

8    secure about it.

9        What they offered as a means to file a

10   complaint, it wasn't safe, it wasn't

11   secure.

12       Look, I told something that happened to

13   the jail administrator and sergeants, and by

14   the next afternoon, every lower level CO

15   working the shift knew what was going on.

16       I mean, that's a failure in a system.

17   I'm sorry, it is.  That didn't create a safe

18   environment for myself at all.  So I'm

19   sorry, I just had to say that.

20   Q    Quite all right.  Have you completed

21   your --

22   A    Yes, I'm done.

23   Q    Okay.  Were you ever strip-searched by

24   CO Drennen?

25   A    No, I was not.

1   Q    Did you ever see any female inmate who

2   was strip-searched by CO Drennen?

3   A    I saw Katie take off her clothes at his

4   request.

5   Q    Did you see Katie Sherman

6   strip-searched by CO Drennen?

7   A    I saw Katie take off articles of

8   clothing when CO Drennen asked her to, yes.

9   Q    Do you know what a strip search is?

10  A    A strip search would be any type of

11  officer asking you to remove your clothing.

12  Q    I see.  So utilizing that definition,

13  you believe that you saw Katie Sherman

14  strip-searched?

15  A    Yes.

16  Q    You were not strip-searched?

17  A    No, I was not.

18  Q    Do you claim that you saw any other

19  female inmate strip-searched by CO Drennen

20  or any other corrections officer in the

21  Trumbull County detention facility?

22  A    No.

23  Q    Now, you claim that Ms. Sherman took

24  off her clothes at Drennen's request.  Did

25  you actually hear at any time Corrections

 1  Officer Drennen say to Ms. Sherman, "Take

 2  off your top?"

 3  A    Yes.  They would talk -- I told you

 4  occasionally they would talk in their codes

 5  about the broom, and things like that, and

 6  at other times when he would be standing by

 7  Katie's bed and Katie would have on, you

 8  know, a tight shirt or be, like, rubbing her

 9  breasts, and that, he would ask her, like,

10  "Well, are you going to show me some more?

11  Come on, show me some more," and say things

12  to her, like, you know, "Why don't you just

13  lift that shirt up," things of that nature,

14  requesting her to expose herself.

15  Q    So you actually heard CO Drennen --

16  A    Yes.

17  Q    -- ask Ms. Sherman to expose her

18  breasts so he could see them?

19  A    Yes.  She was right next to me.

20  Q    Okay.  I just want to understand what

21  you heard as opposed to this so-called code.

22       I want to understand, and again, I'm

23  not trying to denigrate any of your

24  responses.  I just want to understand what

25  was said in plain English.

Page 125

1       You claim that the staffing at the

2  Trumbull County detention facility was such

3  that Sheriff Altiere and/or Lieutenant Shay

4  could have staffed the female pods with all

5  female corrections officers?

6  A    Yes.

7  Q    Do you know how many female corrections

8  officers were employed by the Trumbull

9  County Sheriff's Department in 2014 during

10  your incarceration?

11  A    No, I do not know the exact number.

12  Q    You were on the third floor --

13  A    That's correct.

14  Q    -- when these events occurred?

15  A    Correct.

16  Q    Do you know what other pods are located

17  on the third floor?

18  A    The third floor is three female housing

19  units and one male all lockdown unit, and

20  because it is an all male lockdown unit,

21  both male and female officers can work that

22  pod.

23  Q    It's true, is it not, that there is a

24  female lockdown unit on the third floor?

25  A    They use C Pod, which is a regular pod,

```
 1   as their lockdown pod.  Pretty much the

 2   entire pod itself is not locked down.

 3   However, they have certain cells that they

 4   will lock down that they use for people who

 5   are on punishment, I should say, or mental

 6   health reasons.

 7   Q    As a matter of fact, that's where

 8   suicide watch is, isn't it, on the third

 9   floor?

10   A    Yes, it is.

11   Q    And suicide watch can house both male

12   and female inmates on suicide watch?

13   A    No, that is incorrect.  These are the

14   female pods on the floor:  There is B Pod,

15   the largest pod, then there is C Pod, which

16   was the first pod I was housed in.

17        That is the pod that you are referring

18   to that they will put girls on suicide watch

19   for mental health reasons and also

20   disciplinary reasons.

21   Q    That's on the third floor?

22   A    That's correct.  There is also on the

23   third floor a two-person pod, a -- I think

24   it's a four-person pod and Trustee Pod.  The

25   only male pod on the third floor is the male
```

1    only lockdown, and those gentlemen are on

2    lockdown all day long except for the bit of

3    rec time they have and to be showered.

4        The only time it is necessary in that

5    particular male pod for a male officer to be

6    present is during shower time.  Other than

7    shower times, which only happen three times

8    a week and you get 15 minutes allowed for

9    those showers, at any other time of the day,

10   a female officer can and often does work the

11   rounds on that pod.

12       So out of necessity, the only time you

13   would necessitate a male officer on that

14   floor would be when the gentlemen need

15   showered.

16   Q    And you're using gentlemen in a very

17   broad sense of the term?

18   A    Yes.

19   Q    Nonetheless, you don't have any

20   training in penal or corrections programs,

21   do you?

22   A    No, I do not.

23   Q    So that answer to my question that I

24   just asked was based upon your experience as

25   an inmate?

1    A    Yes.

2    Q    Thank you.  You claim at paragraph 38

3    that jail administration turned a, quote,

4    "blind eye to sexual assaults and strip

5    searches."  Are you testifying that -- is

6    that your claim?

7    A    Yes.

8    Q    I see.  So tell me what facts you're

9    aware of that Lieutenant Shay knew of sexual

10   assaults or strip searches which he did not

11   investigate or cause to have investigated?

12   A    To my knowledge, the only thing I know

13   is that CO Drennen told me that his

14   administrators had, in fact, investigated

15   him for the exact behavior I was asking him

16   to stop doing and that nothing had happened

17   to him.

18        So do I know of any particular

19   instances myself?  No, only of what CO

20   Drennen told me.

21   Q    And if I ask you the same question

22   about Sheriff Altiere, tell me what facts

23   you're aware of that Sheriff Altiere turned

24   a quote/unquote, "blind eye to sexual

25   assaults or strip searches," are you going

Page 129

1    to give me the same answer?

2    A    Yes.

3    Q    Only what Drennen told you?

4    A    Yes.

5    Q    So of your on knowledge, you have no

6    facts to share with me that either Sheriff

7    Altiere or Lieutenant Shay ever turned a

8    blind eye or failed to investigate

9    inappropriate strip searches or sexual

10   assaults in the Trumbull County detention

11   facility, correct?

12   A    Yes.

13              MR. RASKIN:    I think I am

14        done.

15              MS. KOVOOR:    We're not

16        going to waive signature.

17              MR. RASKIN:    Well, wait a

18        minute.  You have another lawyer

19        here.

20              MS. KOVOOR:    I'm so

21        sorry.

22              MR. RASKIN:    Now, the

23        question is it's now five minutes to

24        1:00.  How much time --

25              MS. JARMUSZ:    I mean, I

```
 1          don't mean to be overly repetitive.

 2          I would say 30 minutes at the most.

 3               MR. RASKIN:    It's up to

 4          you all what you want to do.

 5               THE WITNESS:   Yeah, I'm

 6          fine with that.

 7               MS. JARMUSZ:   You want to

 8          just go ahead?

 9               THE WITNESS:   Yep.

10               MS. WILSON:    I think we

11          need a restroom break.

12                    - - -

13          (Short recess taken)

14                    - - -

15   CROSS-EXAMINATION OF MICHELE L. RAFFERTY

16   BY MS. JARMUSZ:

17   Q   Ms. Rafferty, I'm Angel Jarmusz.  I'm

18   technically representing Mr. Drennen, so I'm

19   going to try not to go over things that you

20   already talked about with Mr. Raskin, but I

21   need to focus a little bit more on, you

22   know, the specifics of your interactions

23   with Mr. Drennen.

24        The same general ground rules you had

25   with Mr. Raskin in his questioning, the same
```

1  general ground rules apply.  If something I

2  ask you doesn't make sense, just ask me to

3  repeat it and I'll try to clarify.

4  A    Okay.

5  Q    But during your previous stay at

6  Trumbull County Jail, not in 2014, but the

7  previous stay, did you say that was 2009?

8  A    Yes.

9  Q    Okay.  You noted that you were

10  uncomfortable with Mr. Drennen's conduct.

11  Can you give a little bit more description

12  as to what made him uncomfortable during

13  that stay?

14  A    Sure.  What made me feel uncomfortable,

15  I kind of talked about it a little bit, as

16  opposed to just quickly glancing around my

17  cell like the other COs would do, he would

18  make it a point to -- well, I can get up to

19  do this.

20       Usually when they walk past your cell,

21  they're going this direction, they look it

22  and keep going.

23       Mr. Drennen would square up to the door

24  so that his whole body was covering the

25  front window that looks into your cell, and

1   rather than looking around my cell, he would

2   glare directly at me and not just glare at

3   my face, but glare up and down at me, and

4   whereas most people would just pass by, he

5   would make it a point to stop and leer at

6   you, which is what would make me

7   uncomfortable.

8        But like I said, at that time, it was

9   something simple where I would just either

10  just keep myself covered up with my blanket

11  if I saw that he was the one doing rounds or

12  I would just throw my uniform quickly back

13  on until he was done and then get into bed.

14       I just didn't put myself in a position

15  to be underclothed while he was doing rounds

16  because at that time, the unit I was housed

17  in, he worked, like I said, midnight turn.

18       We were all locked down individually in

19  our cells at that time, so I didn't have any

20  outward exposure to him like I did when I

21  was in C Pod on the floor or when I was in

22  Trustee Pod.  So my contact with him during

23  that stay was really limited.

24  Q    And just for purposes of the record,

25  because it couldn't pick up your

1   demonstration as to how Mr. Drennen looked

2   into your cell versus other corrections

3   officers, you're saying it was typical for

4   corrections officers to spend less time at

5   the window and almost looking over their

6   shoulder perhaps?

7   A    Yes.

8   Q    And Mr. Drennen stood square to the

9   window and lingered longer?

10  A    Yes.

11  Q    Okay.  Did you ever personally witness

12  Mr. Drennen masturbate during that stay?

13  A    No.

14  Q    Did you ever witness Mr. Drennen

15  purposefully look at another inmate who was

16  unclothed?

17  A    No, because at that time, like I said,

18  because we were all locked down at the same

19  time, I wasn't able to see what he did at

20  anyone else's cell doors other than my own.

21  Q    And so you also did not witness Mr.

22  Drennen request any inmate to expose

23  themselves to him at that time?

24  A    No.

25  Q    Okay.  So during your subsequent stay

1  in Trumbull County in 2014, did you

2  personally witness Mr. Drennen masturbate at

3  all?

4  A    No.  He would talk about himself, he

5  would talk about himself getting erections,

6  he would talk about how his pants felt,

7  things of that nature, but I never witnessed

8  him touching himself.

9  Q    Did you ever personally witness Mr.

10  Drennen touch another inmate?

11  A    No, not touch them.

12  Q    But you did witness Mr. Drennen look at

13  an exposed inmate or an inmate who was

14  unclothed?

15  A    Yes.  Not just look at them, but

16  request that she expose herself and asking

17  her to touch herself, things of that nature.

18  I never witnessed him physically touch her,

19  though.

20  Q    And it was one specific inmate that you

21  personally witnessed exposed?

22  A    Yes.

23  Q    Okay.  And that was Ms. Sherman?

24  A    Yes.

25  Q    Can you approximate dates at which Ms.

1   Sherman allegedly exposed herself to Mr.

2   Drennen?

3   A    No, I really couldn't.  It just

4   wouldn't be fair for me to try and guess.

5   Q    No, that's fine.  Did Ms. Sherman ever

6   personally tell you that she wished Mr.

7   Drennen would stop looking at her?

8   A    I -- and I'm sure Katie can talk about

9   this, too.  There were points in time when

10  this was going on that myself and, you know,

11  other girls in the pod would pull Katie

12  aside and say to her, like, "Why are you

13  doing this?  Why are you engaging with him

14  like that?"

15       And Katie would say how, you know, one,

16  it made her feel kind of special that he was

17  giving her this attention and, secondly,

18  that because she had heard that he gave

19  other girls special types of treatment for

20  doing and acting these ways, like that she

21  thought that she was going to, you know, get

22  something out of this situation with him.

23       And, I mean, we tried talking with

24  Katie.  Like I said earlier, I'm really fond

25  of Katie.  I look at her like a little

1  sister.  We spent a lot of time in there

2  together, and my heart at the time just went

3  out for her, you know.

4      As somebody who's been in a position

5  where somebody takes authority over you, I

6  know what a scary position that can be in,

7  and I know what -- I just felt -- like I

8  just wanted to reach in and grab her and

9  help her.  I just wanted to tell her, like,

10  it shouldn't be this way and it doesn't have

11  to be this way.

12      I mean, I think -- I don't even know

13  how to say it, how I want to say it the

14  right way.

15      I tried talking to Katie about not

16  acting that way with him, and she expressed

17  to me that she didn't know how to stop or

18  how to end the type of communication, almost

19  as though because the ball had already

20  started rolling, she didn't how to make it

21  stop at that point, and then I knew she was

22  going to be leaving soon, and I think Katie

23  can tell you better, but I'm sure probably

24  part of her thought was that she was just

25  going to be leaving soon and maybe that's

1    just when it would end.

2    Q    Did you ever witness Mr. Drennen order

3    Ms. Sherman to expose herself or threaten

4    Ms. Sherman with discipline if she did not

5    expose herself?

6    A    I didn't hear him threaten her with any

7    discipline, but on plenty of occasions, I

8    heard him ask her to either expose herself

9    or touch herself or write him notes, and I

10   will say that the notes that she would write

11   would be flirtatious and sexual type notes.

12   Q    Did Mr. Drennen or any other

13   corrections officers order you to watch Ms.

14   Sherman as she was exposed?

15   A    No, nobody ever ordered, but like I

16   said, my bunk in relation to her bunk,

17   they're right next to one another, and so

18   even if I turned my head to not see what's

19   going on, I'm still hearing everything

20   that's going on, so there wasn't -- there

21   wasn't any way not to be a part of what was

22   going on.

23   Q    Do you remember Ms. Sherman ever

24   opposing Mr. Drennen's requests to see her

25   unclothed?

1    A    No.

2    Q    Did Mr. Drennen ever comment on your

3    appearance?

4    A    No.  I will say this for the record,

5    that other than when I had asked Mr. Drennen

6    to stop, he and I had absolutely no

7    conversation.

8         If I needed something from a

9    corrections officer, I would ask whoever

10   else may have been on duty with him or

11   another shift.  I never engaged in any

12   conversation at all with Mr. Drennen.

13        Like I said earlier, he'd already gave

14   me just a bad feeling from my prior

15   experience, and then seeing from C Pod and

16   then into Trustee Pod, I found no reason to

17   engage in any type of contact with him

18   whatsoever.

19   Q    Did Ms. Friend ever come to you and

20   explain to you that she wished Mr. Drennen

21   would stop giving her this extra attention?

22   A    She complained to me when she came back

23   in, after being gone for a couple of days,

24   that she thought it was really uncomfortable

25   that he had called her house, that she was

1  really uncomfortable that she had seen him

2  driving by her house numerous times, and

3  that sort of thing, and she said that it was

4  -- to her, it was awkward when he was coming

5  through for his rounds now that he had done

6  those things.

7  Q    Did you ever wonder why Mr. Drennen

8  never commented on your appearance or

9  complimented you?

10  A    I didn't wonder that.  I never gave him

11  an opportunity to engage in any type of

12  conversation with me.  I never requested

13  anything from him, and as I said earlier, I

14  did those types of things on purpose.  He

15  just sat wrong with me and I found no reason

16  to try and engage with him in any way.

17  Q    So you were never jealous by any of the

18  attention Mr. Drennen gave either Ms.

19  Sherman or Ms. Friend?

20  A    Absolutely not.

21  Q    How exactly did Mr. Drennen personally

22  injure you between February and May of 2014?

23  A    I feel like taking it upon yourself to

24  force other people into listening and

25  watching what you're requesting from someone

1    else for yourself is wrong.

2        I mean, I think it was wrong that he

3    was asking these things of Katie, but I duly

4    think it was wrong to force all of the rest

5    of us to be a part of that.  There was no

6    getting away from it.

7        Like I said, the room was probably

8    maybe just a tad bit bigger than the room

9    that we're in now.  So if I am in this

10   corner having a conversation, no matter how

11   low I may be talking, you're going to hear

12   in that corner, so I felt like he forced all

13   of us to be a part of what he was doing,

14   whether he saw it that way or not.

15   Q    Did you seek treatment, whether through

16   mental health providers or a physician, for

17   the injuries that were caused by Mr.

18   Drennen?

19   A    Yes.  I re-engaged in counseling and

20   then when I was still in Trumbull County

21   Jail, I had filled out a request form to see

22   their liaison from the Coleman agency to

23   talk with him about this specifically and,

24   you know, how I was feeling about all of it.

25   Q    If I remember correctly, you had said

1   earlier that you requested to speak with --

2   was it Rick from Coleman?

3   A    Yes.

4   Q    After you had already spoken with

5   Lieutenant Shay --

6   A    That's correct.

7   Q    -- about the incident?

8   A    Mm-hmm, because at that time, after I

9   made Eric Shay aware of what was going on,

10  like I said, nobody had offered that type of

11  assistance to me.  Eric didn't say, "Look,

12  we have this liaison from Coleman.  If you

13  feel like this is something you need to talk

14  about with somebody, we can provide you with

15  that help, we can provide you with that

16  support."

17       None of that was ever offered to me.

18  I had to take it upon myself after the fact,

19  fill out a request form, then wait for that

20  to go where it needed to go and for Rick to

21  be able to come in and speak with me.

22       So if I had not taken it upon myself to

23  ask for that, the jail administration wasn't

24  doing anything to offer me those types of

25  services there.

1   Q   How come you hadn't requested those

2   services before May 4th or May 5th?

3   A   I guess -- well, not I guess.  Because

4   Coleman is a liaison for mental health.

5   They are not who you would go to to report

6   that type of activity.

7       He works for a mental health agency.

8   They don't -- he doesn't necessarily work

9   for the jail.  He's not a supervisor over

10  the employees.  I just don't think it would

11  be a correct route of reporting something

12  like that.

13  Q   Can you explain your friendship with

14  Ms. Cordwell while you were incarcerated in

15  Trumbull County?

16  A   Sure.  She wasn't there very long.  She

17  was only there for a short time that we were

18  housed together, maybe just a couple of

19  weeks, because shortly after the incident

20  was reported, they went ahead and split all

21  of us girls up into different pods.  They no

22  longer housed us together any longer.

23      So myself, I got moved into B Pod,

24  Tania, I believe, either stayed in that pod

25  or got moved to C Pod.  So, I mean, she was

1   from West Virginia, we had none of the same

2   friends.  I mean, just girl talk like Katie

3   and I would throughout the evening, so I

4   didn't know her well at all.

5        Another girl who was in the pod with

6   us, Jessica Smerdell, I believe she and

7   Tania were there on the same case, they were

8   in the same car together when they got

9   pulled together, so they probably know more

10  about one another than what I could offer.

11  Q    At any time before you and Ms. Cordwell

12  approached or confronted Mr. Drennen, did

13  Ms. Cordwell complain to you about Mr.

14  Drennen?

15  A    Yes, she did.  When Tania first came

16  into our pod and saw what was going on with

17  Katie and CO Drennen, she was just

18  disgusted.  She was, like, "You got to be

19  kidding me."  She was, like, "This was going

20  on where I was housed," which was in B Pod.

21       She said that while she was housed in B

22  Pod, that another girl by the name of

23  Jessica Dean apparently was also favored, I

24  guess, by CO Drennen.  She said that Jessica

25  Dean would often be up in her cell ripping

1    up her indigent panties, turning them into

2    thongs, and whatnot, and putting them on for

3    him during his rounds, talking with him.

4    Just more of the same.

5         I mean, just this same behavior, and to

6    see and hear about behavior that is, I mean,

7    just identical in every single room that

8    he's walking through with females, you have

9    to understand where deep down inside your

10   gut, you think somebody has to know that

11   this has been going on.

12        Like if this is happening in the two

13   months that I'm there with a particular girl

14   in every single female housing unit, I mean,

15   one can only assume that this is not the

16   first time it's happening.  I just find it

17   hard to believe that nobody's ever noticed

18   this type of behavior with him.

19   Q    Why did you and Ms. Cordwell decide to

20   wait four or five days after Ms. Sherman was

21   released before you confronted Mr. Drennen?

22   A    Because he hadn't worked.  It was the

23   first shift since Katie left that he had

24   worked.

25        And like I said earlier, initially it

Page 145

1  wasn't myself waiting to say something to

2  him about it.  Initially we as an entire pod

3  tried stopping him, to say something to him

4  about it, to ask him to stop the behavior,

5  and at that time, he brushed us off and went

6  out the door to finish his rounds.

7       So some of the other girls had fallen

8  asleep because by that time, it's awfully

9  late by the time he came in to do another

10  round.

11       It was myself and Tania who were still

12  awake at that time, but initially we tried

13  confronting him, you know, as a whole to

14  say, "Look, the empty bed we have now, when

15  it gets filled with another young girl, we

16  just don't want to see this go on anymore."

17  Q    Why did you make it a point to wait

18  until Ms. Sherman was already released and

19  gone before bringing this up with Mr.

20  Drennen?

21  A    I think because none of us, you know,

22  none of us really wanted to embarrass Katie

23  or involve her in it, to be honest.  I mean,

24  I wanted the behavior to stop.  I didn't

25  want to embarrass Katie.

```
 1                THE WITNESS:    And I still

 2         don't, Katie.  I just want you to

 3         know that.

 4  BY MS. JARMUSZ:

 5  Q    Can you just explain briefly the

 6  complaint you made with jail administration

 7  about Mr. Drennen's conduct?

 8  A    Sure.

 9  Q    For instance, when and where?

10  A    Sure.  The complaint that I made

11  initially then was to Eric Shay, and that

12  was to him after he had already spoken with

13  and questioned everyone else in the pod.

14      I was put in a separate holding cell

15  while he interviewed all the other girls in

16  the unit.  After he was done interviewing

17  all the other girls in the unit, then I was

18  brought back in to speak with him.

19      It was during that time that I

20  expressed to him that CO Drennen was acting

21  in inappropriate ways, and I told him about

22  how CO Drennen had threatened me about, you

23  know, if I was to go and report it, and at

24  that time, Eric Shay told me, because this

25  was the question I posed to Eric Shay, I
```

Page 147

1    said, "What I don't understand is," I said,

2    "if CO Drennen is correct in what he said

3    and that you were aware of this as being a

4    possible problem with him," I said, "why

5    would you put him on a floor in a position

6    to work around female inmates," and Eric

7    Shay's reply to me was, "Well, you know,

8    sometimes people like that will just say

9    things to try and intimidate you, not

10   because they're true," and for me at that

11   point, it just kind of -- it felt like he

12   drew a line in the sand with me as though it

13   was turning into an us-versus-them

14   situation, and "us" meaning he, himself, his

15   co-workers, and I felt really uncomfortable,

16   so that's why when I was brought down to

17   Major Stewart's office and asked to give a

18   statement, I told them I preferred to wait

19   and give a statement when I had someone to

20   be there on my behalf, because the

21   conversation that I had with Eric Shay, I

22   felt was -- I felt like my best interest

23   might not be the main concern, and I wanted

24   to have someone there with me who my

25   interest was their main concern, and that's

1   why I didn't continue to talk to any of the

2   jail administration any more than that.

3   Q    Just to help me make sense of this all,

4   Lieutenant Shay was not aware of your

5   personal complaint until he had already

6   interviewed other inmates?

7   A    That's correct.  When Mr. Shay and the

8   other sergeants pulled me into the

9   conference room, they made be aware of CO

10  Drennen's conduct report against me.

11       At that time, I told Eric Shay and the

12  sergeants that that most certainly was false

13  and that what he had wrote in there was not

14  true, but that there were things going on in

15  the pod concerning him that needed to be

16  addressed, and I told them that before they

17  even had to hear what I had to say, that

18  they should ask the other girls what was

19  going on.  That's when I was isolated while

20  they spoke to everyone else.

21       Then after that, I was brought back in

22  and that's when I started to tell Eric Shay

23  about my experiences in there with him.

24  Q    Between February and May of 2014, did

25  you ever use the telephones --

1  A    Yes.

2  Q    -- to call family members?

3  A    Yes.

4  Q    And what would you typically talk

5  about?

6  A    I mean, the only people I ever talked

7  to really were my mom, my dad, my daughter

8  and her father, so usually just family

9  stuff, things that were going on.

10  Q    Did you ever talk to either of your

11  parents about Mr. Drennen's conduct and how

12  he made you feel?

13  A    Yes.  My mom and my dad.

14  Q    And did you ever ask them to help you

15  out in this situation?

16  A    Yes.  When I was finished talking with

17  Eric Shay and I was brought back to the pod,

18  I did call home.  I told my dad in a very

19  short-handed way what was going on and asked

20  if they could help provide me with somebody

21  so that I could get out a statement of what

22  was really happening in there, like in a

23  safe way.

24  Q    So the first time that you told your

25  parents about Mr. Drennen's conduct was

1    after Lieutenant Shay had already pulled you

2    aside to question you?

3    A     Correct.

4    Q     Switching gears a little bit, I know

5    you had mentioned earlier that you are now

6    employed?

7    A     Mm-hmm.

8    Q     And you've been working for two months?

9    A     Yeah.

10   Q     After you were released in -- was it

11   August of 2014?

12   A     Mm-hmm.

13   Q     What employment did you have between

14   that date and February of 2016?

15   A     The only employment I had during that

16   time was when I worked at the tax office.

17   Q     Can you approximate how much money you

18   earned in that period of time?

19   A     I mean, I'd say probably under $3000.

20   Maybe even less.

21              MS. JARMUSZ:    I have no

22         further questions.

23              THE WITNESS:    Okay.

24              MR. RASKIN:    You have the

25         right to read this deposition in

1           order to ensure that it's been

2           accurately recorded, or you can

3           waive that right.  I think your

4           lawyer was about to tell you before

5           Ms. Jarmusz started that you were

6           going to read it, but you have to

7           say verbally what you want to do.

8                   THE WITNESS:    Oh,

9           certainly.  I would like to read

10          it.

11                  - - -

12          (Signature not waived)

13      (Deposition concluded at 1:30 p.m.)

14                  - - -

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE

THE STATE OF OHIO,        )
                          ) SS:
COUNTY OF CUYAHOGA.        )


        I, Angelika P. Shane, a Notary Public
within and for the state of Ohio, duly
commissioned and qualified, do hereby
certify that the within-named witness,
MICHELE L. RAFFERTY, was by me first duly
sworn to testify to the truth, the whole
truth and nothing but the truth in the cause
aforesaid; that the testimony then given by
the above-referenced witness was by me
reduced to stenotype in the presence of said
witness; afterwards transcribed, and that
the foregoing is a true and correct
transcription of the testimony so given by
the above referenced witness.
        I do further certify that this
deposition was taken at the time and place
in the foregoing caption specified and was
completed without adjournment.

1     I do further certify that I am not a

2  relative, counsel or attorney for either

3  party, or otherwise interested in the

4  event of this action.

5     IN WITNESS WHEREOF, I have hereunto set

6  my hand and affixed my seal of office at

7  Cleveland, Ohio, this 5th day of March,

8  2017.

9

10

11  _____

12  Angelika P. Shane, Notary Public

13  Within and for the State of Ohio

14  My commission expires 6/21/20

15

16      - - - oOo - - -

# CERTIFICATE

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

CASE:  Michele L. Rafferty, et al.,

vs.

Trumbull County, Ohio, et al.,

CAUSE NO.:  4:16CV00430

DEPONENT: MICHELE L. RAFFERTY

DATE REPORTED:  February 23rd, 2017

DATE SENT FOR SIGNATURE:  March 7, 2017

SENT FOR SIGNATURE TO:  Michele L. Rafferty
3099 Goleta Avenue
Youngstown, Ohio 44505


I, Angelika P. Shane , the undersigned Notary Public in and for the County of  Cuyahoga, do hereby certify that the above-named deponent has failed to subscribe his/her signature to the original deposition transcripts and return same within the allotted 30 day limit under the Federal Civil Rules of Procedure after being notified the deposition is ready for reading and signing, and/or presented to the deponent or his/her attorney for signature.

Therefore, in accordance with the Rules of Procedure, this certificate is submitted.  IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notary seal this  10th  of     April     ,  2017  .


NOTARY PUBLIC

My Commission Expires: 06/21/2020

TACKLA & ASSOCIATES
1020 Ohio Savings Plaza
1801 E. 9th Street
Cleveland, OH 44114

 

March 7, 2017

Michele L. Rafferty
3099 Goleta Avenue
Youngstown, Ohio 44505

Re:    Deposition of **Michele L. Rafferty**
       2/23/2017
       Michele L. Rafferty, et al. v. Trumbull County, Ohio, et al.

Dear Ms. Rafferty:

As you will recall, you did not waive your right to read and sign your deposition.
A copy of your deposition taken in the above referenced matter is now available in our
office for review, weekdays from 8:30 a.m. to 4:00 p.m.  Please call our office at
216-241-3918 for an appointment. You will have the opportunity to list any corrections
on an errata sheet. You must then sign and date the errata sheet.

In accordance with the Federal Rules of Civil Procedure, you must read the transcript, and
sign the errata sheet within 30 days.  Should you have any questions, please don't hesitate
to call.

Sincerely,

Angie Shane
TACKLA COURT REPORTING, LLC

AS/np

cc:    Todd Raskin, Esq.
       Sarah Thomas Kovoor, Esq.
       Angelica M. Jarmusz, Esq.



US POSTAGE
$00.46⁰
First-Class
Mailed From 44114
03/07/2017
032A 0061835031



Tackla
& Associates
Court Reporting & Videotaping
www.tacklacourtreporting.com
216-241-3918  Fax 216-241-3935
1020 Ohio Savings Plaza
1801 East 9th Street
Cleveland OH 44114

Michele L. Rafferty
3099 Goleta Avenue
Youngstown, Ohio 44505