UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION


| | | |
|---|---|---|
| MICHELE L. RAFFERTY, | ) | |
| et al., | ) | |
| Plaintiffs, | ) | Case No. |
| -vs- | ) | 4:16CV00430 |
| TRUMBULL COUNTY, OHIO, | ) | Judge Benita |
| et al., | ) | Pearson |
| Defendants. | ) | |

- - - o0o - - -

Deposition of KATIE SHERMAN, a Plaintiff herein, being called by the Defendants as if upon cross-examination under the statute, and taken before Angelika P. Shane, a Notary Public within and for the State of Ohio, pursuant to agreement of counsel, on Thursday, the 23rd day of February, 2017, at 3:05 p.m., at the offices of Mazanec, Raskin & Ryder Co., LPA, 34305 Solon Road, Solon, Ohio.

- - - o0o - - -

1    APPEARANCES:

2

3         ON BEHALF OF THE PLAINTIFFS:

4

5         Ford, Gold, Kovoor & Simon, Ltd.

6         Sarah Thomas Kovoor, Esq.

7         Thomas D. Lambros, Esq. (Of Counsel)

8         8872 East Market Street

9         Warren, Ohio  44484

10        330-856-6888

11        kovoor@neo-lawgroup.com

12        lambros@neo-lawgroup.com

13

14

15        ON BEHALF OF THE DEFENDANTS

16        TRUMBULL COUNTY, OHIO, TRUMBULL COUNTY

17        SHERIFF'S DEPARTMENT, THOMAS L.

18        ALTIERE, SHERIFF, AND ERIC SHAY,

19        LIEUTENANT:

20

21        Mazanec, Raskin & Ryder Co., LPA

22        Todd M. Raskin, Esq.

23        34305 Solon Road

24        100 Franklin's Row

25        Solon, Ohio  44139

```
 1        440-248-7906

 2        traskin@mrrlaw.com

 3

 4

 5        ON BEHALF OF THE DEFENDANT

 6        CHARLES DRENNEN:

 7

 8        Fishel Hass Kim Albrecht Downey, LLP

 9        Angelica M. Jarmusz, Esq.

10        400 South Fifth Street  Suite 200

11        Columbus, Ohio  43215

12        614-221-1216

13        ajarmusz@fishelhass.com

14

15

16        ALSO PRESENT:  Michele Rafferty

17                       Robin Wilson

18

19                    - - -

20

21

22

23

24

25
```

```
 1              P-R-O-C-E-E-D-I-N-G-S
 2                       - - -
 3              KATIE SHERMAN, of lawful age, a
 4   Plaintiff herein, having been first duly
 5   sworn, as hereinafter certified, deposes and
 6   says as follows:
 7                       - - -
 8      CROSS-EXAMINATION OF KATIE SHERMAN
 9   BY MR. RASKIN:
10   Q    So, Ms. Sherman, you sat through the
11   deposition of Ms. Rafferty, and do you want
12   me to go over kind of the rules of the
13   deposition or the things you need to
14   remember, or are you pretty comfortable?
15   A    I'm good.
16   Q    How would you like me to refer to you?
17   A    Katie.
18   Q    And how are you feeling?
19   A    Good.
20   Q    When is your baby due?
21   A    He's due May 7th, but I think he's
22   coming anywhere from April 20th to the 27th.
23   Q    Is it a he?
24   A    Mm-hmm.
25   Q    Congratulations.  So give us your full
```

1  name and current residence address, would

2  you, please?

3  A    Katie Lynn Sherman and I live at 6280

4  1/2 South Main, Ashtabula, Ohio, 44084.

5  Q    And who do you live there with?

6  A    My mother.

7  Q    How long have you lived there?

8  A    Since December I want to say.

9  Q    Where did you live before that?

10  A    Here and there.  I stayed with family

11  or friends because I didn't get along with

12  my mom.

13  Q    So have you had a reconciliation?

14  A    Hmm?

15  Q    Have you had a reconciliation with your

16  mom?

17  A    We just butt heads a lot.

18  Q    But you're living with her?

19  A    Yeah.

20  Q    I see.  Do you have any children other

21  than the one you're carrying?

22  A    A five-year-old that I do not have

23  custody of.

24  Q    Did you voluntarily give up custody?

25  A    No.  When I was doing my time,

1    Children's Services decided to adopt my son

2    out while I was in jail.  I never signed any

3    paperwork or anything.

4    Q    So you're talking about Ashtabula

5    County Children Services?

6    A    Trumbull County.

7    Q    So Trumbull County CSB filed a petition

8    for custody?

9    A    Mm-hmm.

10   Q    Yes?  You have to say yes.

11   A    Yes.  Sorry.

12   Q    That's all right.  And so your

13   five-year-old child has been -- is he or she

14   in foster care or has he or she been

15   adopted?

16   A    He was adopted out.

17   Q    He was adopted.

18   A    Closed adoption.

19   Q    And were you served with any paperwork

20   in relation to that?

21   A    No.

22   Q    What year did that happen?

23   A    Right before I got out of Trumbull

24   County Jail, sometime in April, 2014.

25   Q    Are you employed?

1    A    No.

2    Q    When were you last employed full-time?

3    A    When I worked at Pentair, which is in

4    Chardon.  It's a factory, in May of 2015.

5    Q    2015?

6    A    Yeah.

7    Q    And the name of the company, could you

8    spell it?

9    A    Pentair, P-E-N-T-A-I-R.

10   Q    What kind of work did you do there?

11   A    I made fiberglass tanks.

12   Q    So it was production work?

13   A    Mm-hmm.

14   Q    Yes?

15   A    Yes.

16   Q    And why did you leave there?

17   A    I had an injury where my finger got

18   smashed by another employee when he picked

19   up a tank, and I had to have surgery because

20   it caused a blood infection in my blood

21   stream from the fiberglass, and I was

22   hospitalized for seven days and they fired

23   me and he got my job.

24   Q    So you were terminated?

25   A    Yeah.

1   Q     Did you file a Workers' Compensation

2   claim?

3   A     No.

4   Q     Prior to Pentair, when did you last

5   work?

6   A     At Lake Effectz in Madison, Ohio,

7   bartending.

8   Q     And how long ago was that?

9   A     I think February of 2015 I quit.

10  Q     When you were fired by Pentair, did you

11  attempt to collect unemployment

12  compensation?

13  A     Huh-uh.  No.

14  Q     What is the highest grade of formal

15  education that you've completed?

16  A     Tenth.

17  Q     Do you have a GED?

18  A     No, sir.

19  Q     Where did you go to school?

20  A     Edgewood and Jefferson and an

21  alternative behavior school.

22  Q     Where was the alternative behavior

23  school?

24  A     Ashtabula, Ohio on State Road.

25  Q     Is that the school that you dropped out

Page 9

```
 1   of?

 2   A    Last attended, yeah.

 3   Q    Were you born and raised in Ashtabula?

 4   A    Yes, sir.

 5   Q    Apart from this case, have you been a

 6   plaintiff or a defendant in any civil case?

 7   A    Nope.

 8   Q    Can you tell me whether or not you've

 9   been convicted of one or more crimes of

10   dishonesty in the last 10 years?

11   A    Yes.  I was convicted of a petty theft

12   in 2012 or 2013.

13   Q    In what court?

14   A    Niles, and then out of Cortland, they

15   had me for attempting to obstruct justice.

16   Q    That was a Cortland court?

17   A    Yeah.  And through Ashtabula County, I

18   have attempting to receive stolen property.

19   Q    I'm sorry?

20   A    Ashtabula County, I have attempting to

21   receive stolen property of a lawn mower I

22   bought.  It was stolen I guess.  I don't

23   know.

24   Q    And were you found guilty of each of

25   those offenses?
```

1    A     I pled guilty, yes.

2    Q     Any other crimes of dishonesty?

3    A     No.

4    Q     So were you convicted -- you were

5    convicted of attempted -- strike that.

6          Were you convicted of the charge of

7    complicity?

8    A     Complicity to?

9    Q     To stolen property in 2012?

10   A     Yeah.

11   Q     And that was in Trumbull County?

12   A     That was in Ashtabula County.

13   Q     That's right.  Judge Mackey is in

14   Ashtabula County.  You're absolutely right.

15   Forgive me.  Or was.

16         And why was an arrest warrant issued

17   for your arrest?

18   A     When?

19   Q     In Ashtabula County.

20   A     Just recently?

21   Q     No.  In 2013.

22   A     Because I didn't go to probation or

23   something.  I really don't recall.

24   Q     Any other convictions of crimes of

25   dishonesty?

1   A     Not that I can...

2   Q     How about drug convictions?

3   A     No.

4   Q     Weren't you convicted of possession of

5   drugs, a felony, in -- no, you weren't.

6   Strike that.  I'm sorry.  Forgive me.

7         Have you been hospitalized in the last

8   10 years other than for the birth of your

9   child?

10  A     Yes.

11  Q     And for your finger?

12  A     Yes, for my jaw.  I broke my jaw in a

13  dirt bike accident when I was 15.

14  Q     How old are you now?

15  A     23.

16  Q     Where were you hospitalized?

17  A     ACMC.

18  Q     For how long?

19  A     A day until they could get me in for

20  emergency surgery.

21  Q     Any other hospitalizations?

22  A     A couple of psychiatric times.  I was

23  in Belmont Pines on multiple occasions and

24  Laurelwood and ACMC.

25  Q     Were you also removed from your

1   family's home?

2   A    Mm-hmm.

3   Q    Yes?

4   A    Yes.

5   Q    You were placed in foster care?

6   A    Yes.  I was adopted when I was 6.

7   Q    The hospitalizations in Laurelwood and,

8   I'm sorry, what was the other one?

9   A    Belmont Pines.

10  Q    Was that as a juvenile?

11  A    Mm-hmm.

12  Q    Yes?

13  A    Yes.

14  Q    Any other hospitalizations as an adult?

15  A    MetroHealth.

16  Q    That was for the MOMS program?

17  A    Yep.

18  Q    Were you actually an inpatient there?

19  A    Yes.

20  Q    For how long?

21  A    Three days.

22  Q    Are you still on that program?

23  A    Huh-uh.

24  Q    Why not?

25  A    Because I took myself out of it.

1   Q    Why?

2   A    Because I told them I didn't want to be

3   on anything and they put me on methadone, so

4   I detoxed off the methadone and haven't done

5   anything or wanted to be on anything.

6   Q    Have you described for me all of your

7   hospitalizations in the last 10 years?

8   A    As far as I can remember.

9   Q    How about the name of the physicians,

10  can you tell me the names of the physicians

11  with whom you've treated?

12  A    I know Dr. Ajit was one of them.

13  Q    Spell his name.

14  A    A-J-I-T, if I'm correct.  Ajit.

15  Q    What did you treat with him for?

16  A    Psychiatric.  He was my psychiatrist.

17  Q    As an adult or juvenile?

18  A    As a juvenile, 16 and 17.  And Dr.

19  Devulapalli I think his name is from Belmont

20  Pines.

21  Q    Did you treat with Dr. LaBash of the

22  Community Counseling Center?

23  A    Yes.

24  Q    Was that between 2009 and 2016?

25  A    Yes.

Page 14

```
 1   Q     Okay.  Are you still treating with him?

 2   A     No.

 3   Q     When's the last time you treated with

 4   Dr. LaBash?

 5   A     It's been a few months.

 6   Q     Okay.  Did you stop going to him --

 7   A     Yeah.

 8   Q     -- voluntarily?

 9   A     Yes.

10   Q     Why?

11   A     Because, like I said, I didn't want

12   anything and then when I went to go to the

13   hospital to detox from the Subutex, they put

14   me straight on to methadone.

15   Q     So was Dr. LaBash somehow involved in

16   the MOMS program at Metro?

17   A     No.

18   Q     So I guess it's unclear to me, then,

19   why you would have stopped treating with Dr.

20   LaBash.  Did he also want to put you on some

21   sort of --

22   A     He had me on Subutex, which made me

23   feel like I was high, and I didn't want it

24   and I didn't want to feel like that.

25   Q     And did you tell him that?
```

 1    A     Yeah.

 2    Q     And what did he say?

 3    A     He recommended me not doing it,

 4    recommended me not discontinuing the

 5    Subutex.

 6    Q     But you did anyway?

 7    A     But I did anyways.

 8    Q     Did you report that you had had severe

 9    opiate dependence for the last six or seven

10    years?

11    A     Mm-hmm.

12    Q     Yes?

13    A     Yes.

14    Q     Do you know what your diagnosis was

15    from Dr. LaBash?

16    A     Opioid dependency.

17    Q     Anything else?

18    A     Hepatitis positive.  Hepatitis C

19    positive.

20    Q     Anything else?

21    A     That's all I can --

22    Q     Were you diagnosed as suffering from

23    severe opioid use disorder?

24    A     Yes.

25    Q     Severe cannabis use disorder?

Page 16

```
 1   A     I wouldn't say severe, but, yes.

 2   Q     I'm just reading what's written here.

 3   Were you diagnosed as suffering from

 4   posttraumatic stress disorder?

 5   A     Yes.

 6   Q     Including posttraumatic stress disorder

 7   for children six years and younger?

 8   A     Yes.

 9   Q     And do you know why you were diagnosed

10   with that condition?

11   A     My dad was a raging alcoholic and he

12   used to beat my mom.

13   Q     Were you diagnosed at any time as

14   bipolar?

15   A     Yes.

16   Q     Also suffering from major depressive

17   disorder?

18   A     Yes.

19   Q     With panic attacks?

20   A     Yes.

21   Q     And these are all conditions that you

22   were diagnosed as suffering from before

23   2014, aren't they?

24   A     Yes.

25   Q     And if I understand your testimony, Dr.
```

1   LaBash put you on a course of treatment

2   which you took yourself off?

3   A    Yes.

4   Q    And you also enrolled in the MOMS

5   program.  That's a program for moms --

6   A    With opiate dependency.

7   Q    With opiate dependency and you took

8   yourself out of that program as well?

9   A    Mm-hmm.

10  Q    Yes?

11  A    Yes.

12  Q    Did you counsel with Kelly Butler?

13  A    From Community Counseling?

14  Q    I can't tell if she was at Community

15  Counseling or at Metro.

16  A    I think she might have been at

17  Community Counseling.

18  Q    So did you counsel with her?

19  A    Once or twice, yes.

20  Q    That's all?

21  A    Yeah.

22  Q    Following your discharge from the

23  Trumbull County Jail in 2014, did you

24  receive any treatment or counseling for

25  whatever problems you felt like you had?

1   A     I tried going for it, but they kept

2   trying to push me on to the Vivitrol shot

3   instead of giving me the actual psychiatric

4   help that I needed, because if they asked me

5   if I was a drug addict, I'm going to tell

6   you the truth, and they just kept pushing

7   the subject and I ended up relapsing after

8   that.

9   Q     Okay.  So the answer to my question,

10  did you receive any --

11  A     No.

12  Q     -- any counseling -- I'm sorry.  You

13  have to let me finish asking the question.

14  A     I'm sorry.

15  Q     Did you receive any counseling for any

16  condition which you claim was caused by your

17  incarceration at the Trumbull County

18  detention facility or made worse by your

19  incarceration at the Trumbull County

20  detention facility in 2014?

21  A     No.

22  Q     No counseling in 2015, '16 or '17,

23  correct?

24  A     No.

25  Q     No, it's not correct?

1    A    No, it is correct.

2    Q    Thank you.  Did you report that you

3    were the subject of domestic violence at

4    home when you were living with your mother

5    and father?

6    A    Did I report it?

7    Q    Yes.

8    A    No.  It was reported by other people.

9    Q    I see.  Do you also have a history of

10   self-mutilation?

11   A    Yes.

12   Q    Cutting your wrists?

13   A    My legs.

14   Q    Were you admitted to the hospital in

15   July of 2016 with symptoms of heroin

16   withdrawal and leukocytosis?

17   A    Yes.

18   Q    And how long were you hospitalized

19   then?

20   A    Three days, I think.  Maybe two and a

21   half, three days.

22   Q    According to my notes, it says that

23   your physical exam was limited due to your

24   lack of compliance.  What does that mean?

25   A    I have no idea.

1   Q     Well, did you cooperate with the

2   medical professionals?

3   A     I --

4   Q     You don't remember?

5   A     No, I really don't.

6   Q     Were you at any time ever involuntarily

7   committed to the hospital?

8   A     Involuntarily?

9   Q     Yes.

10  A     No.

11  Q     Were you aware that your mother

12  requested an involuntary commitment?

13  A     Oh, yeah.  That was in July?

14  Q     Yes, of 2016?

15  A     Yeah, but I went willingly.

16  Q     Oh, so you agreed to go?

17  A     Yeah.  She just made it to where I

18  couldn't sign myself out.

19  Q     Is that as a consequence of your

20  relapse?

21  A     Yes.

22  Q     When did you relapse?

23  A     2015 when I was working at Lake Effectz

24  in Madison.

25  Q     What were you doing there?

1  A    Bartending.  Not the best environment.

2  Q    So you relapsed for more than a year,

3  started using again?

4  A    No.  I stopped and then I started

5  again, but that was when I first relapsed

6  was at Lake Effectz.

7  Q    Are you continuing to treat with Lake

8  Obstetrics?

9  A    Lake County?

10  Q    For your OB?

11  A    No.  I have to transfer back to

12  Ashtabula County.

13  Q    Are you currently receiving any

14  counseling at all?

15  A    No.

16  Q    And the last time you received

17  counseling was before you went to jail in

18  2014?

19  A    Yeah.

20  Q    Did you ever follow the advice you got

21  in July of last year to enter a 12-step

22  program as the advice you received at ACMC?

23  A    Yeah.  I was in IOP when I was seeing

24  Dr. LaBash.

25  Q    Did you also use and abuse amphetamines

1   as well?

2   A    Yes, at one point.

3   Q    Would that have been in 2016?

4   A    Possibly.

5   Q    Do you recall that I served you with a

6   series of written questions that you were to

7   answer under oath --

8   A    Yes.

9   Q    -- called interrogatories?  And did you

10  actually provide answers to those questions?

11  A    Yes.

12  Q    I've got some follow-ups that I'd like

13  to ask you about.

14       I asked you to state the last name --

15  the name, last known address and telephone

16  number of every person who has knowledge

17  concerning the allegations in the lawsuit

18  that you filed, and that was Interrogatory

19  Number 3.

20       The names Kevin Rafferty and Ernie

21  Sherman appear on this list.  Kevin is

22  Michele's father?

23  A    Yes.

24  Q    And Ernie is your father?

25  A    Yes.

1    Q    Am I correct in assuming that your

2    father knows nothing about this apart from

3    what you've told him?

4    A    No.  Actually Detective Stewart

5    contacted my dad to get ahold of me about it

6    when they brought me in for questioning the

7    first time.

8    Q    Because you had already been released?

9    A    Yes.

10   Q    All right.  And does your dad have any

11   personal knowledge of what went on, or just

12   what other people told him?

13   A    He knows a little bit on both ends.

14   Q    Well, how would he have personal

15   knowledge of what happened while you were in

16   --

17   A    Well, through me.

18   Q    From you?

19   A    Yes.

20   Q    But of his own knowledge, he doesn't?

21   A    No.

22   Q    I see you have some notes before you.

23   What are those?

24   A    Oh, just the things that you were

25   asking Michele, the last 10 years of the

 1  places or hospitalizations.

 2  Q    May I see your notes, please?  Let your

 3  lawyer see it first.

 4              MR. RASKIN:    Thank you.

 5  BY MR. RASKIN:

 6  Q    There are some notations on this yellow

 7  sheet of paper you've handed me that says

 8  Abilify, Geodon, Adderall, Vyvanse, Seroquel

 9  and Zoloft.  Are those medications that

10  you're currently taking?

11  A    No.  Those are past medications.

12  Q    Are you on any medication today at all?

13  A    No.

14  Q    Before coming here today, did you and

15  Michele talk about your testimony?

16  A    No.

17  Q    Who is Keith James --

18  A    That's my kid's dad.

19  Q    Who's Arthur Karieski, K-A-R-I-E --

20  A    Keith James Arthur Kanieski.

21  Q    I'm sorry?

22  A    Keith James Arthur Kanieski is my kid's

23  dad.

24  Q    Oh, that's all one name?

25  A    Yes.

1  Q    Keith James Arthur Kanieski.  Okay.

2  Thank you.

3  A    And then Thomas is my boyfriend.

4  Q    And is he the father of your child?

5  A    No.  Keith is.

6  Q    I see.  Looks like you were writing

7  notes back and forth.  Who were you writing

8  them to?

9  A    My lawyer.

10          MR. RASKIN:    I apologize.

11          MS. KOVOOR:    That's all

12      right.

13          MR. LAMBROS:    No, I watched

14      her during the testimony of

15      Michele.  She was taking notes like

16      you and I and Sarah take notes,

17      Todd.

18          We ought to get away from the

19      implications of somebody holding a

20      note.

21          MR. RASKIN:    No

22      implications.

23  BY MR. RASKIN:

24  Q    Have you treated with or met Dr. Robert

25  Gordon?

1    A    I don't recall.

2    Q    Have you ever gone to Texas to be

3    evaluated by a psychologist?

4    A    No.

5    Q    While you were in the Trumbull County

6    detention facility, did you counsel with

7    anyone from Coleman?

8    A    Honestly, I don't remember.

9    Q    You know what Coleman is?

10   A    Yeah.

11   Q    What is it?

12   A    It's their, like, signature, I don't

13   know, counseling place or -- I don't know.

14   Q    It's for mental health counseling?

15   A    Yes.

16   Q    So while you were in the Trumbull

17   County detention facility in 2014, you

18   didn't, as far as you can recall, counsel

19   with anyone from Coleman?

20   A    Yeah, I don't remember.

21   Q    You were only in the Trumbull County

22   detention facility once; is that right?

23   A    Twice altogether.

24   Q    When was the other?

25   A    In 2011 maybe or 2012 when they first,

1    like, arrested me for the charge of

2    attempting to obstruct justice.  I went

3    there for a whole day and had to bond out,

4    and then went back in 2013.

5    Q    And you were in for about six months?

6    A    Yes.  Got there in November, left April

7    30th.

8    Q    And have you been in jail anyplace else

9    since then?

10   A    No, not since I got out.

11   Q    Have you spoken to any of the other

12   women who were in your pod about this case

13   since you've been discharged?

14   A    No.

15   Q    I asked you a question in Interrogatory

16   Number 14 to specify in detail the damages

17   you claim to have sustained as a result of

18   the allegations contained in your Complaint,

19   and your response was "Emotional and

20   psychological damage, emotional distress,

21   anxiety, PTSD, nightmares, panic attacks

22   which have increased in intensity and have

23   not subsided."  Did I read your answer

24   accurately?

25   A    Yes.

```
 1   Q     It is true, is it not, that no
 2   psychologist, psychiatrist or behavioral
 3   health professional has diagnosed you as
 4   suffering from any mental health condition
 5   which has gotten worse since your discharge
 6   from Trumbull County Jail, correct?
 7   A     Correct.
 8   Q     Thank you.  And each one of the
 9   conditions that you described for me in
10   response to Interrogatory Number 14 you had
11   well before you ever got into Trumbull
12   County Jail, didn't you?
13   A     Correct, but it didn't help matters at
14   all.
15   Q     Did you at any time -- well, strike
16   that.
17         You heard the questions I asked Ms.
18   Rafferty concerning the kite system --
19   A     Yes.
20   Q     -- in Trumbull County?
21   A     Yes.
22   Q     And you would agree it's a three-part
23   form?
24   A     Honestly, I've never seen one before.
25   Q     Well, I guess that answers the next
```

1   series of questions I had.

2       So am I correct in assuming that you

3   never wrote a kite for the purposes of

4   alerting jail administration?

5   A    No.

6   Q    Specifically Sheriff Altiere or

7   Lieutenant Shay about the conduct which you

8   complain about in this lawsuit?

9   A    No, I never got a chance to get a kite

10  in my possession.

11  Q    Well, did you ever ask for one?

12  A    I asked Nobbs if I could talk to her

13  about it and she was supposed to come and

14  talk to me and never came and talked to me.

15  Q    Who's --

16  A    Nobbs?  She's a corrections officer.

17  Q    Okay.  Did you request a kite from

18  Corrections Officer Nobbs?

19  A    A kite and for her to come and talk to

20  me about it and she never came back, so I

21  just let it go.

22  Q    Is Nobbs N-O-B-S?

23  A    N-O-B-B-S, I believe.

24  Q    When did you request a kite from

25  Corrections Officer Nobbs?

1   A    About maybe 60 days prior to my

2   release.

3   Q    Do you know that or are you guessing?

4   A    I'm estimating.

5   Q    Okay.  So, let's see, you were released

6   --

7   A    April 30th.

8   Q    I'm sorry?

9   A    April 30th I was released.

10  Q    And so you think sometime --

11  A    Anywhere from a month or two months

12  before.

13  Q    So you think about 60 days before,

14  which would have been the end of February?

15  A    Possibly, yes.

16  Q    So is it your testimony that Mr.

17  Drennen had engaged in one or more

18  inappropriate acts with you in February of

19  2014?

20  A    Yes.

21  Q    Are you guessing or are you --

22  A    No, I'm saying yes.

23  Q    When in February?

24  A    I couldn't tell you when.

25  Q    What makes you confident that it was

1  February?

2  A    Because it slowed down more towards the

3  end of my stay.  He was sexually

4  misconducting.

5  Q    I understand, but how is it that it

6  wasn't in March?  I'm just trying to

7  understand what your thinking is when you

8  say that you made this request in February

9  as opposed to March or January?

10  A    Because I'm almost certain it was

11  almost two months.  It could have been less

12  than two months, but it was definitely close

13  to the end of my stay.

14  Q    So sometime close to the end of your

15  stay.  Was Corrections Officer Nobbs doing

16  rounds?

17  A    She was supposed to come back after her

18  rounds and she never did.

19  Q    No, I understand.  But when you

20  approached her initially, was she doing

21  rounds?

22  A    Yes.

23  Q    And what did you tell her?

24  A    I said, "I need to talk to you about a

25  situation and I would like to have a kite,"

1    and she never came back.

2    Q    So you didn't report to Corrections

3    Officer Nobbs that former CO Drennen was

4    acting in a sexually inappropriate way with

5    you, did you?

6    A    No, because I wasn't going to say it

7    out loud in front of everybody.

8    Q    But the answer to my question is no,

9    you didn't report that, correct?

10   A    Yes.

11   Q    And you never reported that to

12   Lieutenant Shay or Sheriff Altiere either,

13   did you?

14   A    Nope.  I just gave up after that.

15   Q    You didn't report the conduct of former

16   Corrections Officer Drennen to any member of

17   jail administration at any time during your

18   incarceration in Trumbull County, did you?

19   A    Nope.

20   Q    Did you ever see Corrections Officer

21   Nobbs again in your pod after the day you

22   asked her to come back and talk to you?

23   A    Yes, but I just -- like I said, I let

24   it go.

25   Q    So you never re-engaged her with a

1  request for a kite or with information

2  concerning the treatment you were receiving

3  from Corrections Officer Drennen, correct?

4  A    No.

5  Q    Does "no" mean you didn't do that?

6  A    No, it means like -- that --

7  Q    Let me strike that and I'll ask it

8  again.

9       Did you see Corrections Officer Nobbs

10  after the day on which you asked her to come

11  talk to you?

12  A    Yes.

13  Q    And on those subsequent occasions when

14  you saw Corrections Officer Nobbs, did you

15  request a kite to report former Officer

16  Drennen's conduct?

17  A    No.

18  Q    Did you tell her about former Officer

19  Drennen's conduct?

20  A    No.

21  Q    Okay.  You heard Ms. Rafferty describe

22  that she believed that you had engaged --

23  well, strike that.

24       You heard Ms. Rafferty describe that on

25  three to four occasions during the time the

1   two of you were housed together, you bared

2   your breasts to former Corrections Officer

3   Drennen?

4   A    Yes, upon his request.

5   Q    And do you agree that that happened

6   three to four times?

7   A    Yes.

8   Q    And you heard Ms. Rafferty testify that

9   on one or two occasions, you masturbated --

10  A    Yes.

11  Q    -- for former Corrections Officer

12  Drennen?  Do you agree that that's the

13  frequency and time when that occurred?

14  A    Yes.

15  Q    So over a 60-day period of time, there

16  were four to five encounters with yourself

17  and former Corrections Officer Drennen where

18  you either exposed a part of your body to

19  him or masturbated at his request?

20  A    Yes, because he asked for it.

21  Q    And on none of those occasions, either

22  before or after, did you report that conduct

23  to anyone in jail administration at all,

24  correct?

25  A    Yes.

1    Q    You also heard Ms. Rafferty testify

2    that when she asked you why you were doing

3    that, you said that you -- she attributed to

4    you the statement that you enjoyed the

5    attention that you were getting.  Is that

6    true?

7    A    Yes.

8    Q    And that's why you didn't report him,

9    right, because you enjoyed it?

10   A    Right, and he was also intimidating to

11   me.

12   Q    But the fact that you enjoyed the

13   attention you were getting from him is why

14   you didn't report him, at least in part,

15   right?

16   A    Partially, yes.

17   Q    Now, you say that former Corrections

18   Officer Drennen intimidated you?

19   A    He was -- yes.

20   Q    Did he threaten you in any way?

21   A    No.  He just came across as

22   intimidating to me.

23   Q    By words that he used?

24   A    His appearance.

25   Q    His physical appearance?

1  A    Yes.

2  Q    So he didn't verbally threaten you in

3  any way?

4  A    Never to me.

5  Q    And former Corrections Officer Drennen

6  didn't touch you inappropriately at any

7  time, did he?

8  A    No.

9  Q    Of your own personal knowledge, you

10  don't know what training former Corrections

11  Officer Drennen had in corrections?

12  A    No, I do not.

13  Q    You were diagnosed as suffering from

14  bipolar disorder in 2009; were you not?

15  A    Yes.

16  Q    Were you homeless in October of 2016?

17  A    No, but yes.

18  Q    Okay.  By that, do you mean you were

19  living with a friend, but you had no place

20  --

21  A    I was living with my mom, but it wasn't

22  supposed to be known at the time.

23  Q    Okay.  What do you mean by that?

24  A    Her landlord only approved for her and

25  her husband to live there and I was staying

1  there without her landlord knowing.

2  Q    Well, why would you have lied to the

3  Community Counseling Center of Ashtabula

4  about your living arrangements?

5  A    I never lied to him.  When he picked me

6  up from my mom's work, when he said that I

7  was sleeping in her car, I was sleeping in

8  her car because I went to work with her that

9  day.

10  Q    When who picked you up?

11  A    Dave from Community Counseling.

12  Q    According to the records that I've

13  reviewed, it indicates in October you were

14  homeless and living with a friend.  Is that

15  not true?

16  A    My mom being the friend.

17  Q    I see.

18  A    Yeah.

19  Q    And you lied about that because you

20  thought that would violate your mother's

21  lease?

22  A    It would have violated her lease

23  because of who her landlord is.

24  Q    Who's her landlord?

25  A    Tony.  I don't know his last name.  I

1    just know his name is Tony.  He owns the old

2    Guerriero's Funeral Home in Ashtabula, Ohio.

3    Q    Did you report to the counselor, Kelly

4    Butler, at the Community Counseling Center

5    of Ashtabula that you were hospitalized

6    numerous times for self-harm behavior?

7    A    Yeah.

8    Q    You were hospitalized at Laurelwood at

9    age 17?

10   A    Yes.

11   Q    You were also diagnosed in 2016 -- I'm

12   sorry, you were also diagnosed in 2000 --

13   well, when you were at Laurelwood with

14   severe major depressive disorder?

15   A    Mm-hmm.

16   Q    Yes?

17   A    Yes.

18   Q    And also with posttraumatic stress

19   disorder, correct?

20   A    Yes.

21   Q    Were you continuing to use opiates

22   during your pregnancy?

23   A    No, I wasn't continuing.  I had gotten

24   off of opiates when I was almost four and a

25   half months pregnant.

1    Q    So at 12 weeks pregnant, you were using

2    opiates?

3    A    Yes.

4    Q    And you reported that to Ashtabula

5    Community Counseling Center, didn't you?

6    A    Yes, and that's when they helped me get

7    into the MOMS program.

8    Q    Which you then dropped out of?

9    A    Yes.

10    Q    Did you enter a level 1B intensive

11    outpatient treatment program through

12    Ashtabula County Community Counseling Center

13    as they suggested?

14    A    IOP?  Is that what they consider IOP?

15    Q    I don't know what that -- I don't see

16    anything written like that.  It says a 1B

17    intensive -- yeah, I guess IOT could be

18    slang for that.

19    A    Yes.

20    Q    Did you enter that program?

21    A    Yes.

22    Q    Are you still in it?

23    A    No.

24    Q    And the reason?

25    A    Because I got off of the Subutex.

```
 1   Q    So that program required you to be on

 2   Subutex?

 3   A    Yes.

 4   Q    So am I correct in understanding that

 5   the program you entered into in order to

 6   protect your baby, the MOMS program, you

 7   voluntarily left?

 8   A    Yes, because I didn't want to see my

 9   child detox.

10   Q    And the program for your own physical

11   and emotional well-being that Ashtabula

12   County Counseling Center recommended, what

13   you referred to as the IOT program, you also

14   left?

15   A    Yes.

16   Q    Were you admitted as an inpatient to

17   detox from heroin in July of 2016 --

18   A    Yes.

19   Q    -- at Ashtabula County Medical

20   Center?  When you went to the Ashtabula

21   County Medical Center and the Ashtabula

22   Counseling Center, you were asked to give a

23   history of why you were there, weren't you?

24   A    When I went in 2016?

25   Q    Yes.
```

1    A    I believe so.

2    Q    Okay.  And when you were at the

3    Ashtabula County Counseling Center in 2016

4    --

5    A    Mm-hmm.

6    Q    -- you didn't make any mention of

7    anything that happened while you were in the

8    Trumbull County Jail as any of your

9    complaints at all, did you?

10   A    No.

11   Q    When you were at the Ashtabula County

12   Medical Center, your chief complaints were

13   drug problems and depression, weren't they?

14   A    Yeah.

15   Q    No mention of Corrections Officer

16   Drennen, anything that happened to you while

17   you were in the Trumbull County detention

18   facility, right?

19   A    No.

20   Q    And when you were taken to the MOMS

21   program at Metro, once again, no mention at

22   all in any of your complaints about what

23   happened when you were incarcerated,

24   correct?

25   A    No, because I learned how to block

1    things out.

2    Q    The fact of the matter is you were

3    asked what problems you were suffering from

4    and that wasn't one of the problems you

5    described, was it?

6    A    No.

7    Q    You don't have any facts to share with

8    me, do you, that Sheriff Altiere knew

9    anything about what you claim Corrections

10   Officer Drennen was doing to you, correct?

11   A    No, because when I left, I left

12   everything at the door.  I didn't want to

13   take it home.

14   Q    And likewise, you have no facts to

15   share with me that Lieutenant Shay knew

16   anything about what Corrections Officer

17   Drennen, you claim, was doing to you,

18   correct?

19   A    Correct.  I didn't even know what he

20   was for.

21   Q    And you don't have any facts to share

22   with me one way or another concerning the

23   training that former Corrections Officer

24   Drennen had as a corrections officer or law

25   enforcement officer, do you?

1    A    Can you --

2    Q    Repeat that?

3    A    Yes.

4    Q    You don't know what training former

5    Corrections Officer Drennen had as a

6    corrections officer or a law enforcement

7    officer, do you?

8    A    No.

9    Q    And you also don't know what

10   supervision he received as a corrections

11   officer at Trumbull County, do you?

12   A    No.

13   Q    Did Corrections Officer Drennen make

14   any promises to you about what he would do

15   for you if you engaged in the conduct he

16   asked you to engage in?

17   A    No.

18   Q    You were never strip-searched in the

19   Trumbull County detention facility, were

20   you?

21   A    No, but he did ask me to remove

22   articles of clothing.

23   Q    Right.  But he never strip-searched

24   you, did he?

25   A    No.

1  Q    Did you ever say to Drennen, "No, I'm

2  not going to do" --

3                 MR. LAMBROS:    I didn't

4           understand that last question.

5                 MR. RASKIN:     She said no.

6                 MR. LAMBROS:    No, I

7           understand what she said, but it's

8           the manner in which you're forming

9           the question.  She was stripped.

10                 MR. RASKIN:     I said

11           strip-searched.

12                 MR. LAMBROS:    What's the

13           difference?  The search -- a search

14           is looking, seeing, and the object

15           of take your clothes off is so that

16           individual can look and search.

17                 So what you're doing, you're

18           getting into legal discussions and

19           putting a question to her that isn't

20           appropriate.

21                 MR. RASKIN:     Thank you.

22                 MR. LAMBROS:    Thank you for

23           recognizing it.

24  BY MR. RASKIN:

25  Q    Did you ever tell former Corrections

1    Officer Drennen that you would not remove

2    whatever article of clothing or articles of

3    clothing he asked you to remove?

4    A    No, because I was intimidated by him.

5    Q    Did he threaten you if you didn't do as

6    he asked?

7    A    No, but I didn't know what to expect if

8    not.

9    Q    And to be clear, former Corrections

10   Officer Drennen never touched you at all; is

11   that correct?

12   A    Not physically, no.

13   Q    Of your own personal knowledge, you

14   are unaware of any similar conduct by former

15   Corrections Officer Drennen towards any

16   other female inmates, are you?

17   A    Can you repeat the --

18   Q    Of your own personal knowledge, are you

19   aware of any similar conduct former

20   Corrections Officer Drennen engaged in with

21   any other females?

22   A    Like other females as he did to me?

23   Q    Yes.

24   A    Yes.

25   Q    Who?

Page 46

1    A    Jessica Friend.

2    Q    Did you observe that?

3    A    No.  I've heard her talk about it.

4    Q    Okay.  So that's what I meant when I

5    said of your own personal knowledge.

6         So did you actually observe former

7    Corrections Officer Drennen engage in

8    similar conduct with Jessica Friend or any

9    other female inmate?

10   A    No, but I did witness Jessica -- Lean?

11   Q    Jessica Dean?

12   A    I think that was her name.  She was the

13   girl that used to make thongs out of the

14   paper underwear.  I'm pretty sure that's her

15   name.  I'm not a hundred percent sure.

16   Q    That's not a name that --

17                 MS. KOVOOR:    It was

18          Jessica Dean.

19   BY MR. RASKIN:

20   Q    Were you in the same pod?

21   A    Yes.  I was on the boat on the floor at

22   that time because I got removed out of

23   Trustee Pod.

24   Q    I see.  And do you know whether or not

25   Jessica Dean ever reported that?

1    A    No, I do not know.

2    Q    And what did you see specifically that

3    Jessica Dean did?

4    A    She would dance in front of her door

5    when he would walk through and he would stop

6    and stand there for a moment.

7    Q    Did you ever hear former Corrections

8    Officer Drennen ask her to do that?

9    A    No.

10   Q    Okay.  So let me make sure that I

11   understand.  You're saying that the facility

12   was overcrowded, so were you sleeping on a

13   mat?

14   A    On a boat, yeah, the plastic beds they

15   have.

16   Q    Yeah, and that's in the day room?

17   A    Yes.

18   Q    So you were in a position to observe --

19   A    Everything.

20   Q    -- what Jessica Dean did and where

21   former Corrections Officer Drennen was at

22   the time?

23   A    Mm-hmm, yes.

24   Q    And did you report that to jail

25   administration?

Page 48

1  A    No.

2  Q    Did you keep any type of a diary or any

3  writing at all to record what happened and

4  when?

5  A    No, I shouldn't have had to because

6  there's a lot of cameras in the building.

7  Q    My question is did you?

8  A    No.

9  Q    Was it your impression that the cameras

10 were recording what you were doing?

11 A    They record everything.

12 Q    So it's your understanding that the

13 cameras record every square inch of the

14 detention facility?

15 A    Yes, as far as I know.

16 Q    Okay.  Do the cameras move or are they

17 fixed?

18 A    I don't know if they move or not.

19 Q    Well, weren't you in a pod?

20 A    Yes, but there's black over the camera,

21 like tinted over the camera so you can't see

22 the camera personally, but it can see you.

23 Q    Well, I was just in the pod that you

24 were housed in and the camera was fixed in

25 the corner --

1   A    Yes.

2   Q    -- right up by the ceiling in the wall.

3   A    Yes.

4   Q    So you can see where the camera was,

5   right?

6   A    Right, but you can't see the actual

7   camera itself, but it sees you.

8   Q    You knew where it was?

9   A    Yes.

10  Q    And you could see that it didn't move,

11  couldn't you?

12  A    I never paid attention to the cameras.

13  Q    Never paid attention.  Okay.  Fair

14  enough.

15       Did former Corrections Officer Drennen

16  ever say to you that he had been

17  investigated at any time prior to your

18  incarceration for similar conduct?

19  A    No.

20  Q    You have to take your hand away --

21  A    No.

22  Q    -- from your mouth, please.  Okay.

23  Thank you.  Just so Angie can hear you and

24  so an old guy like I can hear you.

25       So Drennen never told you that; is that

1    right?

2    A    Yes.

3    Q    And you don't have any facts to share

4    with me that Drennen was ever accused of

5    such a thing at any time prior to your

6    incarceration, do you?

7    A    As far as my knowledge, no.

8    Q    So you were already discharged from

9    the Trumbull County detention facility when

10   the subject of former Corrections Officer

11   Drennen's alleged conduct came to light; is

12   that right?

13   A    Yes.

14   Q    And is that why Major Stewart reached

15   out to your dad, in an effort to find out

16   where he could reach you or how he could

17   reach you?

18   A    Yes.

19   Q    And did your father have that

20   information?

21   A    Yes.  I was living with my father at

22   the time.

23   Q    And so did you speak with Major

24   Stewart?

25   A    My father drove me from Jefferson, Ohio

1    to the Trumbull County Jail for questioning.

2    Q    Did you give a written statement?

3    A    No.  It was audio.

4    Q    Okay.  So Major Stewart told you he was

5    going to record the questions he asked and

6    the answers you gave?

7    A    Yes, but he never really explained to

8    me why I was there and it was really awkward

9    talking to a man my dad's age about the

10   things that happened.

11   Q    Well, what did Major Stewart tell you

12   the reason was for his wanting to interview

13   you?

14   A    Allegations against Drennen.

15   Q    What allegations?

16   A    Sexual miscon -- the sexual whatever

17   you guys say.

18   Q    Well, you tell me in your own words.

19   You're testifying.

20   A    Sexual misconduct.

21   Q    Okay.  So when you say it was really

22   awkward, was it awkward because you had to

23   answer his questions or you were asked to

24   answer his questions and he was a man who

25   was the age of your dad?

1    A    Yes.

2    Q    Was your dad in the room at the time

3    that you and Major Stewart talked?

4    A    No.

5    Q    Was anybody else in the room other than

6    you and Major Stewart?

7    A    No.

8    Q    Did Major Stewart tell you what the

9    allegations were against Corrections Officer

10   Drennen?

11   A    Yes, and then he went into detail with

12   questionings and then I just didn't want to

13   deal with it.

14   Q    So what allegations specifically did

15   Major Stewart tell you had been brought

16   against former Corrections Officer Drennen?

17   A    About me and his whatever.  When he

18   would come in, receive notes from me, I

19   would show him my breasts when he would ask

20   me to, I would take articles of clothing off

21   when he asked me to, but I denied it all in

22   the recording because I didn't want to deal

23   with it.

24   Q    So when Major Stewart asked you whether

25   or not these things were true, you said they

1  were not?

2  A    Yes, because I did not want to deal

3  with it.

4  Q    So you lied to Major Stewart?

5  A    Yes.

6  Q    In fact, you denied that any of the

7  things that Michele Rafferty said you did

8  actually happened, didn't you?

9  A    Yes, because I didn't want to deal with

10  it.  I didn't want to be publicly humiliated

11  or anything.

12  Q    Well, you were in a private room with a

13  law enforcement officer; were you not?

14  A    Right, but eventually it is now in the

15  paper, correct?  So, like, that's publicly

16  exploit, and that's what I didn't want to

17  have happen.  But now for justice, sure, go

18  for it.

19  Q    So it's okay for it to be public now,

20  but not okay for --

21  A    It wasn't --

22  Q    You have to let me ask my question,

23  please.

24       So it's okay for it to be public now,

25  but not okay for you to honestly say what

1   happened when you were in a private room

2   with a law enforcement officer; is that your

3   testimony?

4   A    I was in the room with a grown man my

5   dad's age.  It made it very awkward, so I

6   didn't want to talk about it.

7   Q    Did you ask Major Stewart if he would

8   make arrangements to have a female

9   corrections officer interview you instead of

10  him?

11  A    No, because, like I said, I didn't want

12  to relive it.  I didn't want to have to be

13  there again.

14  Q    Did you tell Major Stewart that you

15  were uncomfortable with the questions he was

16  asking you?

17  A    No, because I was unprepared for any of

18  that.

19  Q    And you know the difference between

20  telling the truth and lying, right?

21  A    Yes.

22  Q    And so you knew at the time that Major

23  Stewart was asking you the questions that he

24  was asking that you were intentionally being

25  dishonest with him, correct?

 1  A    Correct, because I didn't want to deal

 2  with it.

 3                  MR. LAMBROS:    I think

 4           there's a difference between

 5           dishonest and the circumstances

 6           under which Kathy (sic) had to

 7           confront an officer.

 8                  Here's a young girl, bipolar,

 9           posttraumatic stress syndrome.  This

10           girl was not well, and she's going

11           to not understand the circumstances

12           under which she would be interviewed

13           at that time.

14                  Dishonest?  No, not

15           necessarily dishonest.  She wasn't.

16           It was she was not admitting to what

17           he was asking, but that wasn't under

18           all these circumstances dishonest.

19                  For that reason, I would

20           think the question is inappropriate

21           with respect to whether or not she

22           was being dishonest.

23  BY MR. RASKIN:

24  Q    You never complained about former

25  Corrections Officer Drennen's unwanted

Page 56

1    sexual conduct to either Sheriff Altiere or

2    Lieutenant -- I just lost his name -- Eric

3    Shay, did you?

4    A    No.

5    Q    Let me get that question out again so

6    that it doesn't include my --

7                    MS. KOVOOR:    Is somebody

8         knocking on the door?

9                    MR. RASKIN:    Off the

10        record.

11                    - - -

12        (Discussion had off the record.)

13                    - - -

14   BY MR. RASKIN:

15   Q    So one more time.  You never reported

16   the inappropriate conduct which you allege

17   former Corrections Officer Drennen engaged

18   in with you to either Sheriff Altiere or to

19   Lieutenant Eric Shay, correct?

20   A    Correct.

21   Q    And, in fact, when you were questioned

22   about it by Major Stewart, you denied it

23   ever happened, correct?

24   A    Correct.

25   Q    Thank you.  Did former Corrections

1  Officer Drennen ever threaten you with

2  anything if you didn't do as he asked?

3  A    No, it never got to that point because

4  I didn't know what to expect if I didn't do

5  it.

6  Q    I understand that.  I'm not saying --

7  I'm not asking you if you ever resisted.

8  I'm saying did he ever say --

9  A    No.

10  Q    -- threatening words to you, If you

11  don't do as I ask, then this or that or the

12  other thing will happen?

13  A    No.

14              MR. LAMBROS:  Isn't every

15         request by a corrections officer an

16         order, violation of an order

17         comprised of punishment?

18  BY MR. RASKIN:

19  Q    Do you know when you were contacted to

20  meet with -- well, strike that.

21       Do you know when Ms. Rafferty made her

22  complaint to jail administration?  I know

23  you had been released, but have you

24  subsequently learned when that was or what

25  the timeline was?

1    A    Sometime in May, I know that.

2    Q    When were you called in?

3    A    At least maybe almost a week after I

4    was out.

5    Q    So it would have been sometime during

6    the first week of May?

7    A    Yeah.

8    Q    Okay.  I may have asked you this

9    question.  If I did, I apologize.

10        Have you spoken to any of the other

11   women who were in the pod with you during

12   the time that you claim Drennen engaged in

13   this conduct --

14   A    No.

15   Q    -- about what they saw or said in the

16   form of statements?

17   A    No, I haven't.

18   Q    Okay.  Tell me how your life has been

19   affected as a result of the treatment you

20   claim that you suffered from by former

21   Corrections Officer Drennen, please.

22   A    Can you repeat that?

23   Q    Sure.  Tell me how your life has been

24   affected as a result of the treatment that

25   you claim you suffered from by former

1    Corrections Officer Drennen.

2    A     My PTSD that I have grown over from

3    being a child to an adult has definitely, I

4    want to say, increased due to the fact of

5    being sexually abused as a child.

6    Q     Anything else, or have you completed

7    your answer?

8    A     Completed my answer.

9    Q     Okay.  So when you say your PTSD has

10   increased, I want to make sure that I

11   understand that.

12         Can we agree that there are symptoms

13   associated with posttraumatic stress

14   disorder?

15   A     Yes.

16   Q     What are the symptoms that you have

17   which have gotten worse?

18   A     I have vivid night terrors.

19   Q     Night terrors?

20   A     Yes, and flashbacks.

21   Q     I think I asked this question, but just

22   so that I'm clear, no doctor or behavioral

23   health professional has said that your PTSD

24   has gotten worse since you were released

25   from jail; is that correct?

1    A    Correct.

2    Q    And when you say night terrors, do you

3    mean nightmares?

4    A    They're different than nightmares.

5    Q    Tell me what the difference is.

6    A    I wake up crying and shaking.

7    Q    And with what frequency have you

8    experienced night terrors since your

9    discharge from the Trumbull County detention

10   facility?

11   A    Can you repeat that, sir?

12   Q    How often have you -- well, strike

13   that.

14        How often do you experience night

15   terrors since you were discharged from the

16   Trumbull County Jail?

17   A    A lot.  About three -- two to three

18   times a week.

19   Q    And how often were you experiencing

20   night terrors before you went into the

21   Trumbull County Jail?

22   A    More so less, once or so a month.

23   Q    And what about flashbacks, how often --

24   well, first of all, what flashbacks were you

25   experiencing before you went into the

1    Trumbull County Jail?

2    A    Of my mom and dad with their physical

3    altercations.

4    Q    When you say your mom and dad with

5    physical altercations, do you mean that your

6    mom and dad were physically abusing you or

7    each other?

8    A    Each other.  Like my mom stabbed my

9    dad, my mom cut her wrist with glass.

10   Q    And so you would have flashbacks to

11   those events?

12   A    Yeah.

13   Q    Is that yes?

14   A    Yes.

15   Q    I'm sorry, do you need to take a

16   break?  I apologize.

17                 MS. KOVOOR:    Why don't we

18         take a break?

19                       - - -

20             (Short recess taken)

21                       - - -

22   BY MR. RASKIN:

23   Q    With what frequency do you experience

24   flashbacks now versus before your

25   incarceration?

1    A    Now it's, like I said, it's more weekly

2    than it used to be.

3    Q    When you say, "more weekly," I know you

4    know what you mean, but I don't.  Do you

5    mean once a week?

6    A    Like a couple times a week.

7    Q    Two --

8    A    Two to three times a week.

9    Q    So it's the same frequency as night

10   terrors?

11   A    Yes.

12   Q    And how about before?

13   A    They weren't as bad as my night

14   terrors, so I'd say once every two months, I

15   would say, two or three months.

16   Q    And did your opiate use affect either

17   your night terrors or flashbacks?

18   A    No.  That's how I numbed myself.

19   Q    Okay.  So they went away when you were

20   doing drugs?

21   A    Yes.

22   Q    And when you stopped doing drugs, they

23   returned?

24   A    Yes.

25   Q    So then you weren't -- you relapsed in

1    2015 and '16?

2    A    Yes.

3    Q    So does that mean you were not

4    experiencing any night terrors or flashbacks

5    in 2015 and '16 while you were doing drugs?

6    A    No, I was not.

7    Q    And then once you got off the opiates

8    when you were four months pregnant,

9    plus/minus, then the flashbacks and night

10   terrors returned and with greater frequency?

11   A    Yes.

12   Q    Okay.

13   A    Also doesn't help with the pregnancy

14   either.

15   Q    Have you described for me now all of

16   the effects that you feel like that you've

17   experienced which you attribute to the

18   claims you make against former Corrections

19   Officer Drennen?

20   A    Yes.

21              MR. RASKIN:    I don't have

22        any further questions.  Thank you.

23                   - - -

24   CROSS-EXAMINATION OF KATIE SHERMAN

25   BY MS. JARMUSZ:

1    Q    All right, Katie, I'm Angel Jarmusz.

2    I know I introduced myself to Michele.  As I

3    said in her deposition, it's the same ground

4    rules that you just went through with Mr.

5    Raskin.  I'll try to keep it even shorter

6    than I did with Michele.

7         Again, I'm representing Mr. Drennen, so

8    my questions are going to be specific to

9    your interactions with him.

10   A    Okay.

11   Q    And I'm just going to get right to it

12   and ask you how exactly Mr. Drennen

13   personally injured you?

14   A    Personally injured me?  Well,

15   definitely psychologically it injured me for

16   sure, brought back a lot of different

17   things, so I learned how to block it out.

18   Q    With those psychological injuries

19   caused by Mr. Drennen, did you seek medical

20   or mental health treatment?

21   A    No, because my main priority when I did

22   seek treatment, it was not for that

23   reasoning, it was for my child

24   specifically.

25   Q    When you were incarcerated in Trumbull

1   County, did you use the telephones?

2   A    Not all the time.   Barely.

3   Q    Who did you talk to if you did use

4   them?

5   A    My dad.

6   Q    And how come you never talked to your

7   dad about Mr. Drennen's conduct?

8   A    'Cause that's not something I would

9   talk to my dad about, honestly.

10   Q    Did you ever personally witness Mr.

11   Drennen masturbate in your presence?

12   A    No.

13   Q    Did any other corrections officer give

14   you unwanted sexual attention?

15   A    No.

16   Q    What about you made Mr. Drennen seek

17   you out?

18                  MS. KOVOOR:    Objection.

19          Speculation.

20   BY MS. JARMUSZ:

21   Q    Do you have any -- let me rephrase

22   this.

23          When you had spoken with Major Stewart

24   in May of 2014, you remember that

25   conversation?

1    A    Yes.

2    Q    You had said at that time, you had a

3    little crush on Mr. Drennen while you were

4    in the Trustee Pod; is that correct?

5    A    Yes.

6    Q    Did you ever express that crush to Mr.

7    Drennen?

8    A    Not specifically, no.

9    Q    Can you describe for me the content of

10   your notes that you would pass Mr. Drennen?

11   A    Well, I mean, they were flirtatious, I

12   guess, and nothing, like, derogatory of me

13   expressing myself to him.  It was more just

14   like "Hey, how are you" kind of things and

15   such.  Nothing to the extent...

16   Q    In any of those notes, did you suggest

17   meeting up with him after you were

18   released?

19   A    Not that I can recall.

20   Q    Did you ever observe other inmates pass

21   notes to Mr. Drennen that weren't the formal

22   kite requests?

23   A    No.

24   Q    Going back to that May 4th or 5th

25   interview with Major Stewart in 2014, do you

1  remember him, Major Stewart, telling you

2  multiple times that you were not obligated

3  to answer his questions?

4  A    Yes, but I didn't know if I was going

5  to be in trouble or not because cops are

6  allowed to lie to you and I just got out of

7  jail, so that's why I denied it all because

8  I didn't know what to expect the outcome to

9  be.

10  Q    This might sound repetitive, but I just

11  want to clarify everything.  Do you remember

12  during that interview saying you were

13  positive that you had never masturbated for

14  Mr. Drennen?

15  A    Yes.

16  Q    And do you remember stating that Mr.

17  Drennen had never asked you to expose

18  yourself?

19  A    Yes.

20  Q    I think you probably answered this

21  question, but if you were uncomfortable with

22  Major Stewart's questioning, state again why

23  you didn't stop answering those questions.

24  A    I didn't know whether I was going to be

25  in trouble or not.

1              MS. JARMUSZ:    I honestly

2         don't think I have anything

3         further.

4              MR. RASKIN:     Signature?

5              MS. KOVOOR:    We'll read.

6                   - - -

7         (Signature not waived)

8      (Deposition concluded at 4:45 p.m.)

9                   - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE

2

3    THE STATE OF OHIO,     )

4                          ) SS:

5    COUNTY OF CUYAHOGA.    )

6

7        I, Angelika P. Shane, a Notary Public

8    within and for the state of Ohio, duly

9    commissioned and qualified, do hereby

10   certify that the within-named witness,

11   KATIE SHERMAN, was by me first duly sworn to

12   testify to the truth, the whole truth and

13   nothing but the truth in the cause

14   aforesaid; that the testimony then given by

15   the above-referenced witness was by me

16   reduced to stenotype in the presence of said

17   witness; afterwards transcribed, and that

18   the foregoing is a true and correct

19   transcription of the testimony so given by

20   the above referenced witness.

21       I do further certify that this

22   deposition was taken at the time and place

23   in the foregoing caption specified and was

24   completed without adjournment.

25

1    I do further certify that I am not a

2  relative, counsel or attorney for either

3  party, or otherwise interested in the

4  event of this action.

5    IN WITNESS WHEREOF, I have hereunto set

6  my hand and affixed my seal of office at

7  Cleveland, Ohio, this 6th day of March,

8  2017.

9

10

11  _____

12  Angelika P. Shane, Notary Public

13  Within and for the State of Ohio

14  My commission expires 6/21/20

15

16          -  -  -  oOo  -  -  -

17

18

19

20

21

22

23

24

25

# CERTIFICATE

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

CASE:  Michele L. Rafferty, et al.,

vs.

Trumbull County, Ohio, et al.,

CAUSE NO.: 4:16CV00430

DEPONENT: KATIE SHERMAN

DATE REPORTED:  February 23rd, 2017

DATE SENT FOR SIGNATURE:  March 7, 2017

SENT FOR SIGNATURE TO:  Katie Sherman
6280 1/2 South Main Street
Ashtabula, Ohio 44084

I, Angelika P. Shane , the undersigned Notary Public in and for the County of  Cuyahoga, do hereby certify that the above-named deponent has failed to subscribe his/her signature to the original deposition transcripts and return same within the allotted 30 day limit under the Federal Civil Rules of Procedure after being notified the deposition is ready for reading and signing, and/or presented to the deponent or his/her attorney for signature.

Therefore, in accordance with the Rules of Procedure, this certificate is submitted.  IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notary seal this   10th  of      April      ,  2017  .

_____
NOTARY PUBLIC.

My Commission Expires: 06/21/2020

TACKLA & ASSOCIATES
1020 Ohio Savings Plaza
1801 E. 9th Street
Cleveland, OH 44114





March 7, 2017

Katie Sherman
6280 1/2 South Main Street
Ashtabula, Ohio 44084

Re:     Deposition of **Katie Sherman**
        2/23/2017
        Michele L. Rafferty, et al. v. Trumbull County, Ohio, et al.

Dear Ms. Sherman:

As you will recall, you did not waive your right to read and sign your deposition.
A copy of your deposition taken in the above referenced matter is now available in our
office for review, weekdays from 8:30 a.m. to 4:00 p.m.  Please call our office at
216-241-3918 for an appointment. You will have the opportunity to list any corrections
on an errata sheet. You must then sign and date the errata sheet.

In accordance with the Federal Rules of Civil Procedure, you must read the transcript, and
sign the errata sheet within 30 days.  Should you have any questions, please don't hesitate
to call.

Sincerely,

Angie Shane
TACKLA COURT REPORTING, LLC

AS/np

cc:    Todd Raskin, Esq.
       Sarah Thomas Kovoor, Esq.
       Angelica M. Jarmusz, Esq.

US POSTAGE
$00.46⁹
First-Class

Mailed From 44114
03/07/2017
032A 0061635031



Katie Sherman
6280 1/2 South Main Street
Ashtabula, Ohio 44084

Tackla
& Associates
Court Reporting & Videotaping
www.tacklacourtreporting.com
216-241-3918  fax 216-241-3935

1020 Ohio Savings Plaza
1801 East 9th Street
Cleveland OH 44114